**DISTRICT OF COLUMBIA, Appellant,**

v.

**Agnes BARRITEAU and Thomas Barriteau, Appellees.**

**No. 13110.**

District of Columbia Court of Appeals.

Argued Oct. 17, 1978.

Decided March 16, 1979.

Edward E. Schwab, Asst. Corp. Counsel, Washington, D. C., with whom John R. Risher, Jr., Corp. Counsel, Washington, D. C., at the time the brief was filed, and Richard W. Barton, Deputy Corp. Counsel, Washington, D. C., were on the brief, for appellant.

Jack H. Olender, Washington, D. C., with whom Daniel R. Kane, Washington, D. C., was on the brief, for appellees.

Before NEWMAN, Chief Judge, and NEBEKER and YEAGLEY, Associate Judges.

NEWMAN, Chief Judge:

This case arises from a negligence action in which the jury returned a verdict in favor of appellees and awarded damages totalling $225,000.[1] In this appeal, the District of Columbia concedes the issue of liability, but challenges the amount of the damage award. Two issues are presented

---

1. Verdict for Mrs. Barriteau was for $200,000; verdict for Mr. Barriteau for loss of consortium was for $25,000.

for our determination: (1) whether the trial court erred in permitting the jury in a personal injury case to consider the impact of future inflation in arriving at a damage award representing appellee's loss of future earnings; and (2) whether the trial court erred in refusing to allow the District to cross-examine appellee's expert witness as to the future impact of income taxes on appellee's loss of future income. After setting forth the relevant facts in Part I, we discuss in Part II the issue of future inflation and conclude that it is a proper factor for the jury to consider in determining loss of future earnings. In Part III, we conclude that the District has not properly preserved the issue of income taxes for resolution on appeal. We affirm.

## I.

On March 27, 1975, Mrs. Agnes Barriteau was treated at the Upshur Street Clinic, an agency of the District of Columbia. During the course of this treatment, a doctor, while attempting to perform a spinal tap, punctured her approximately thirteen times at a vertebral interspace substantially above the accepted situs for performing spinal taps. As a result, Mrs. Barriteau sustained traumatic injury to the *conus medullaris,* in the spinal cord, resulting in paralysis of the lower extremities and bodily function organs. These injuries necessitated emergency surgery and the performance of a decompressive laminectomy.[2] The conceded negligence of appellant left Mrs. Barriteau with a left leg smaller and weaker than the right through atrophy, inability to properly lift the left foot, a pronounced limp, trembling of the foot, back pain from a pelvic tilt from the leg and foot injury, and urological complications.[3]

At trial the evidence established that Mrs. Barriteau, who was a nursing assistant

at the time of her injuries, cannot perform her work since it requires lifting and strenuous movement. She can do only "baby-sitting", or companion-type work for private patients and she can do this only on a limited basis. In addition, appellee's vocational expert witness testified that Mrs. Barriteau would be unlikely to "succeed at most sedentary factory jobs." The vocational expert concluded that Mrs. Barriteau would be virtually unemployable except in a limited capacity in her field of nursing assistance.

Evidence also established that Mrs. Barriteau was 39 years old at the time of her injury in March 1975. She was then employed as a full-time nursing assistant receiving wages at an annual rate of $6,422 which at the time of trial would have been $8,580. As a result of the injuries to her spinal cord and the restriction in her work activity to only part-time, light-duty nursing assistant's work, she has sustained a pay reduction to only $4,000 per year at the time of trial in October 1977.

To quantify Mrs. Barriteau's claim for lost earnings and future loss of earning capacity, appellees utilized the expert testimony of an economist, Dr. Richard J. Lurito.[4] Dr. Lurito testified that his projections of Mrs. Barriteau's salary were based on her history of earnings and that he based her life expectancy on HEW tables. He stated that her work life/retirement date was based on relevant figures of the Department of Labor Statistics using the median age of 62. He also stated that her salary and benefits at the time of trial would have amounted to $8,580 per year.

Taking her salary of $8,580, Dr. Lurito then applied an escalation factor of six percent a year which was based on a study of the kind of occupations under discussion, nurses and nurses' assistants. He then cal-

---

2. A laminectomy is an operation involving the excision of the posterior arch of a vertebrae.

3. Dr. Everett Gordon, who examined Mrs. Barriteau for defendant, established that she sustained 25 percent permanent disability to her entire body as a result of the injury to her leg and foot and a 10 percent permanent disability

to her entire body as a result of the injury to her back. She must remain under a urologist's care for weakness of the bladder.

4. Dr. Lurito was qualified as an expert witness by the trial court without objection by the District.

culated the number of dollars that Mrs. Barriteau would likely have earned from the time of her injury to the end of her expected work life at age 62, had she not been injured. That gross figure came to $331,384. Dr. Lurito testified that he chose the six percent escalation factor based on an analysis of workers' compensation that has been experienced in the economy over the past 30 years. He explained that the six percent escalation included a factor for productivity growth as well as an inflation factor. He noted that in recent years the rate of inflation alone has been substantially higher than six percent, but over the long term the six percent figure was a reasonable figure. Dr. Lurito also testified that recent increases for nurses and nurses' assistants have been substantially more than six percent per annum.

Dr. Lurito next reduced the $331,384 gross figure to its present value by applying a 5.25 percent discount rate. In computing the discount factor he worked from a prior 20-year average because he was projecting a 20-year average. He testified that the 5.25 percent discount rate was composed of government bond averages and corporate bond averages over a period of years. Dr. Lurito then applied the six percent escalation factor to the $4,000 annual income Mrs. Barriteau is now capable of earning because of her injuries and projected it to age 62. That figure came to $160,971. Applying a 5.25 percent discount factor to that yielded a present value of $91,318. The difference between the two present value figures is $103,399, the amount of the loss, as projected by Dr. Lurito.

Counsel for the District cross-examined Dr. Lurito on his projections and the as-sumptions which formed the basis for his figures. The District had Dr. Lurito prepare a list of his assumptions and used the list in cross-examination and closing argument to the jury. The District also requested rulings from the trial court that they be allowed to cross-examine Dr. Lurito regarding the impact of federal and District of Columbia income taxation on Mrs. Barriteau's projected loss of future income. The trial court denied the request. The District made no proffer of what it expected Dr. Lurito's testimony on income taxation would be. Nor did the District present any expert witnesses of its own or proffer of such witnesses' testimony on the issue of income taxes.

The jury returned a verdict for Mrs. Barriteau of $200,000 and verdict for Mr. Barriteau of $25,000 for loss of consortium. The District filed a motion for a new trial or in the alternative for a remittitur. The trial court denied appellant's motion and this appeal followed.

## II.

The District of Columbia contends that the trial court erred in permitting the jury to consider the impact of future inflationary trends in arriving at a damage award representing appellee's projected loss of future earnings. This issue is one of first impression in this jurisdiction.[5]

In the District of Columbia, the primary purpose of compensatory damages in personal injury cases "is to make the plaintiff whole." *Kassman v. American University,* 178 U.S.App.D.C. 263, 267, 546 F.2d 1029, 1033 (1976). *See Snowden v. District of Columbia Transit System, Inc.,* 147 U.S.App.D.C. 204, 205, 454 F.2d 1047,

---

5. Appellee contends that *Washington & Rockville Ry. v. La Fourcade,* 48 App.D.C. 364, 368–69 (1919) and *Hord v. National Homeopathic Hosp.,* 102 F.Supp. 792, 796–97 (D.C.1952), aff'd, 92 U.S.App.D.C. 204, 204 F.2d 397 (1953), should control our disposition of the case at bar. In *La Fourcade,* the court held that in estimating damages for personal injuries the jury could take into account the fact that the value of the dollar had significantly depreciated between the time of the accident and the time of trial. In *Hord,* the court reviewed a damage award alleged to be excessive on the ground that smaller awards in earlier cases for similar injuries were held to be excessive. The court merely rejected the validity of comparing earlier cases with the case at bar where there had been substantial inflation in the interim. *See United States v. English,* 521 F.2d 63, 72–73 (9th Cir. 1975). In the present case, we are confronted with the validity of a jury taking into account impact of future inflation. While these cases are illuminative, they are not dispositive.

1048 (1971); *Hudson v. Lazarus,* 95 U.S. App.D.C. 16, 18, 217 F.2d 344, 346 (1954). "[D]amages awarded in personal injury actions are aimed at compensating the victim or making · good his losses." D. Dobbs, Handbook of the Law of Remedies § 8.1 at 540 (1973). For this reason, loss of future earnings is a distinct item of damages, which if properly proved at trial, may result in recovery for the plaintiff. *See McDermott v. Severe,* 25 App.D.C. 276, 290 (1905), *aff'd,* 202 U.S. 600, 26 S.Ct. 709, 50 L.Ed. 1162 (1906); *Washington and Georgetown Railroad v. Patterson,* 9 App.D.C. 423, 436 (1896). *See generally* C. McCormick, McCormick on Damages § 86 at 299–309 (1935).[6]

There exists a trend among a number of courts to allow the jury to consider the impact of future inflation in arriving at damage awards representing loss of future income in personal injury cases. *See Willmore v. Hertz Corp.,* 437 F.2d 357, 359–60 (6th Cir. 1974); *Lumber Terminals, Inc. v. Nowakowski,* 36 Md.App. 82, 373 A.2d 282, 290–91 (1977); *Ossenfort v. Associated Milk Producers, Inc.,* 254 N.W.2d 672, 683–84 (Minn.1977); *Markham v. Cross Transportation, Inc.,* 376 A.2d 1359, 1364 (R.I.1977); *Schnebly v. Baker,* 217 N.W.2d 708, 727–28

(Iowa 1974); *Plourd v. Southern Pacific Transportation Corp.,* 266 Or. 666, 677–79, 513 P.2d 1140, 1146–47 (1973). *Cf. Cords v. Anderson,* 80 Wis.2d 525, 549–52, 259 N.W.2d 672, 683–84 (1977) (jury may consider effect of inflation on future medical expenses). Recognizing that plaintiffs might not be adequately compensated if juries were not allowed to consider inflation, these courts have observed that "[i]nflation has become a fact of life within the experience of everyone. It has continued to a greater or lesser extent throughout most of our lifetimes. Most people have found it necessary to reckon with this in their own financial planning for the future." *Seaboard Coast Line Railroad v. Garrison,* 336 So.2d 423, 424 (Fla.App.1976).[7]

Other courts maintaining that consideration of the future effects of inflation is merely a speculative enterprise have refused to allow juries to consider such evidence in arriving at damage awards. *See Williams v. United States,* 435 F.2d 804, 807 (1st Cir. 1970); *Sleeman v. Chesapeake and Ohio Railway Co.,* 414 F.2d 305, 307–08 (6th Cir. 1969). *See generally* II F. Harper & F. James, The Law of Torts § 25.11 at 1323–26 (1956).[8]

---

**6.** Simply stated, the loss of the future earning capacity represents the amount that the injured party would have earned but for the injury. Therefore, evidence must be presented regarding the demonstrated earning capacity of the injured party prior to the injury and this figure must be projected over the remaining working life of the injured party taking into account expected future earning increases. Secondly, the actual future earning capacity must be ascertained, and this sum is determined by evaluating what the injured party can now be expected to earn in light of diminished physical capacity. Finally, both must be reduced to their present value, using a valid discount rate. The difference between the two present value figures is the present value of the loss of future earnings. *See generally* O'Connor and Miller, *The Economist-Statistician: A Source of Expert Guidance in Determining Damages,* 48 Notre Dame Law 354, 362–63 (1972).

**7.** Courts have also allowed juries to consider the impact of future inflation on the loss of the decedent's future earnings in wrongful death cases. *See United States v. English, supra* at 72–74; *Perry v. Allegheny Airlines, Inc.,* 489 F.2d 1349, 1353 (2d Cir. 1974); *Good v. A. B.*

*Chance Co.,* 565 P.2d 217, 225–26 (Colo.App. 1977). The above-cited federal cases were based on federal claims where the court applied the state substantive law of damages. We perceive no difference in the rationale supporting jury consideration of inflation in wrongful death cases as opposed to personal injury cases.

**8.** Harper and James have appropriately characterized this debate:

Future trends in the value of money are necessarily unknown and so always render such damages speculative in a way we cannot escape. If the estimates represent a straight-line projection of present living costs, they will be frustrated by fluctuations either way. If prophecy of change is heeded, frustration will follow if no change, or the opposite change, occurs. When courts have consciously grappled with the problem they have either found all prophecy too speculative and so, perforce, have taken the equally speculative course of betting on a continuance of the status quo; or they have made intuitive and not always very wise judgments that present conditions represent a departure

We are of the view that those opinions which permit evidence of inflation are the better reasoned ones. To preclude the jury from considering the impact of future inflation not only ignores past economic trends which demonstrate the decline of the purchasing power of the dollar, but also assumes that the purchasing power of the dollar will remain forever constant. We are of the opinion that this position is contrary to sound economics in view of the fact that governmental, private, and personal financial planning are based precisely on such future trends. While predicting future rates of inflation does involve some degree of speculation, that is not a sufficient basis for entirely precluding such evidence since there is speculation and imprecision inherent in any computation of loss of future economic benefit. Indeed, the alternative—that of precluding any consideration of inflation—is equally as speculative. As the court in *United States ·v. English,* 521 F.2d 63, 75 (9th Cir. 1975) observed:

> While predicting future inflationary trends, or extrapolating from present ones, may be speculative, so are most predictions courts make about future incomes, expenses (as, for example, in the case of the wrongful death of an infant). Since it is still more probable that there will in the future be changes in the purchasing power of the dollar, it is better to try as best we can to predict them rather than to ignore them altogether.

▪ We hold that it is proper for the jury to consider the impact of future inflation in arriving at future loss of income in personal injury cases. We do not suggest by our holding that in all cases the jury should be allowed to consider inflation. There must be a proper factual predicate in the record to support the jury's consideration of future inflationary projections. "[A] jury should never be permitted to guess as to a material element of the [plaintiff's] case such as damages . . . ."

*Courtney v. Giant Food, Inc.,* D.C.App., 221 A.2d 92, 94 (1966). In short, there must be competent evidence which sets the future rate of inflation within reasonable limits.

▪ Courts which allow the jury to consider inflation in computing loss of future earnings have used two methods. Some courts allow evidence that assumes that the plaintiff would have had wage increases equivalent to the inflationary trend. This figure is then reduced to its present value. *See* D. Dobbs, *supra,* § 8.7 at 575. Other courts allow juries to consider inflation by not reducing the award to its present value. *See Leavitt v. Gillaspie,* 443 P.2d 61, 68–69 (Alaska 1968); *Beaulieu v. Elliott,* 434 P.2d 665, 671 (Alaska 1967). We reject the view that inflation may be taken in consideration by not reducing the award to its present value.

We are aware that arriving at a sum representing future loss of earnings often involves a complicated procedure. To arrive at a reasonable figure the trier-of-fact must have evidence pertaining to the age, sex, occupational class, and probable wage increases over the remainder of the working life of the plaintiff. For this reason, in personal injury cases no less than wrongful death cases, "the task of projecting a person's lost earnings lends itself to clarification by expert testimony because it involves the use of statistical techniques and requires a broad knowledge of economics." *Hughes v. Pender,* D.C.App., 391 A.2d 259, 262 (1978).

▪ Not every element of damages warrants the use of expert testimony, and the decision to admit expert testimony lies within the sound discretion of the trial court. *Id.; District of Columbia v. Davis,* D.C.App., 386 A.2d 1195, 1200 (1978). Generally, "when the subject dealt with is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman, its clarifica-

from some imaginary norm to which they think we shall rapidly return. It is not at all clear that courts would be willing to hear experts on the matter, or that they would get much real help if they did. For the most part

the problem—which is inevitably present in every case of future loss—is not analyzed and the present value of money is assumed to be the proper basis. [II F. Harper & F. James, *supra* at 1325–26 (footnotes omitted).]

tion calls for the use of expert testimony." *Id.,* citing *Waggaman v. Forstmann,* D.C. App., 217 A.2d 310, 311 (1966). The test simply stated is whether such expert testimony "will be likely to aid the trier in the search for truth." *Jenkins v. United States,* 113 U.S.App.D.C. 300, 306, 307 F.2d 637, 643 (1962). However, where the existence of substantial future economic loss becomes an issue, the use of expert testimony likely would be necessary since seldom will lay witnesses possess the requisite background to testify on a matter such as this— one not likely to be within the common knowledge of the average layman. In sum, "[t]he complexities of economics, no less than those of medicine, merit the assistance of expert testimony, so important to an adequate assessment of plaintiff's damages." *Ossenfort v. Associated Milk Producers, Inc., supra* at 684. As this court has recently observed, "[w]hen properly utilized, such expert testimony can provide a rational basis for the jury's determination of an individual's future earnings, and thus can minimize the risk of jury speculation present whenever future earnings must be predicted." *Hughes v. Pender, supra* at 263.

 Of course the expert testimony must have a proper factual foundation and must be based upon evidence in the record. We note that expert testimony on the impact of future inflation on the loss of future earnings like all other properly admitted testimony is only *evidence* of future inflationary trends. The expert may be cross-examined and contrary expert evidence also may be introduced.

 In the present case, we are satisfied that the expert's testimony was supported by a proper factual foundation. Appellee's expert testified as to facts in the record. He based his calculations of her loss of future income on analysis of workers' compensation and inflation rates over the past 30 years. Moreover, appellant was permitted to cross-examine appellee's expert economist. Appellant's trial counsel had the expert prepare a list of his assumptions, and used those assumptions in his cross-exami-

nation and closing argument to the jury. We hold that the trial court did not err in permitting the jury to consider the effects of future inflation in arriving at a damage award representing appellee's loss of future income.

### III.

As its second assignment of error, the District contends that the trial court erred in excluding cross-examination of appellee's economist as to the effect of taxation on appellee's loss of future earnings.

 It is well settled that " '[q]uestions not properly raised and preserved during the proceedings under examination . . . will normally be spurned on appeal.' " *Kassman v. American University, supra,* 178 U.S.App.D.C. at 266, 546 F.2d at 1032, quoting *Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967). To properly preserve excluded testimony for review on appeal, trial counsel must normally make an offer of proof. *See generally* Super.Ct.Civ.R. 43(c). This offer of proof is "not to meet a technical requirement but [is necessary] to lay the foundation for an affirmative showing of error." *Shlopak v. Davison,* D.C.Mun.App., 34 A.2d 126, 127 (1943). *See Reamer v. Blumenthal,* D.C.Mun.App., 154 A.2d 364, 366 (1959); *Pitts v. United States,* D.C.Mun.App., 95 A.2d 588, 590 (1953); *Brown v. Haas,* D.C. Mun.App., 72 A.2d 39, 40 (1950).

 In the present case, the District made no such offer of proof and presented no witnesses on the issue of taxation in its own behalf during trial. The District came to trial, not with projections of such tax consequences, but with a naked request that it be permitted to cross-examine appellee's expert economist on this subject without any showing that the expert possessed sufficient information upon which he could base an opinion. As the court stated in *Good v. A. B. Chance Co.,* 565 P.2d 217, 226 (Colo.App.1977), when confronted with a similar issue:

> During cross-examination of the plaintiff's expert, [appellant] sought to elicit a

simple answer from the expert that income taxes had not been considered in his compilation of figures. The expert was not permitted to answer. [Appellant] did not show that the witness had information upon which to base an opinion on the effect of income taxes and made no offer of proof on the projected tax burden.

Under these circumstances, the trial court did not err in refusing to permit [appellant's] general inquiry about the effect of income taxes on anticipated future earnings.

In view of the state of the record in this case, we cannot say that the trial court committed error on this issue.

*Affirmed.*