Marvin **WALDMAN** and Daniel
Steven, Appellants,

v.

Aaron M. **LEVINE** and Essie L. Swann,
**Administratrix of the Estate of Beatrice
Swann Pratt, Appellees.**

No. 86–1405.

District of Columbia Court of Appeals.

Argued March 3, 1988.
Decided June 16, 1988.

Jamie M. Bennett, with whom John P. Arness and Paul M. Snyder, Washington, D.C., were on the brief, for appellants.

Waldemar J. Pflepsen, Jr., with whom Robert F. Condon, Washington, D.C., was on the brief, for appellee Aaron M. Levine.

Charles C. Parsons, Washington, D.C., for appellee Essie L. Swann.

Before PRYOR, Chief Judge, ROGERS, Associate Judge, and KERN, Senior Judge.

ROGERS, Associate Judge:

Appellants Marvin Waldman and Daniel Steven (appellants) are attorneys who represented appellee Essie L. Swann (Swann) in an action for medical malpractice arising out of the death of her daughter Beatrice Swann Pratt. Swann, administratrix of her daughter's estate, sued appellants for legal malpractice, alleging that they had been negligent in representing her in the medical malpractice action. Appellants principally appeal the jury verdict on the grounds that (1) Swann's legal expert distorted the standard of care for attorneys in medical malpractice actions, and (2) Swann's evidence of legal malpractice was factually and legally insufficient. Appellants appeal from the dismissal of their third-party complaint against Swann's successor counsel, appellee Aaron M. Levine (Levine), and a directed verdict on the issue of Levine's alleged negligence in failing to file a motion to set aside the settlement and vacate the dismissal of the medical malpractice case as an intervening cause of Swann's loss. We hold that the trial court did not err in denying appellants' motion for judgment notwithstanding the verdict or a new trial since the expert's testimony was properly admitted and Swann presented sufficient evidence from which the jury reasonably could find that appellants were negligent. We further hold that the motions judge did not err in dismissing the third party complaint since application of the normal rules of indemnity for an alleged successor, independent tortfeasor is incompatible with the attorney-client relationship when successor

counsel must choose between alternative courses of action. Accordingly, we affirm.

## I.

Beatrice Pratt died on November 24, 1975, at Columbia Hospital for Women twelve days after giving birth to her fourth child. The cause of death was determined to be pelvic thrombophlebitis, a condition including clotting in the veins in the pelvic area. During exploratory surgery conducted by the attending physicians twelve days after the delivery of the child, portions of the blood clot mass broke away, traveled up the inferior vena cava,[1] passed through the heart and into the pulmonary arteries, blocking the flow of blood to the lungs and causing death. Swann, the decedent's mother, subsequently retained appellant Waldman to file a wrongful death and survival action for medical malpractice against the hospital and a number of physicians who had treated her daughter. Appellant Steven, an associate of Waldman, also worked on Swann's case.

### A.

*The Medical Malpractice Action.* Appellants first asked Dr. Ann Dimitroff, a local internist, to review the decedent's medical records and to assess the conduct of the decedent's attending physicians. Based upon her initial review, Dr. Dimitroff concluded that the care provided by the attending physicians did not conform to the standard of care for obstetrician-gynecologists (OB/GYN's) in such circumstances. Appellants accordingly filed suit on November 23, 1976, against Columbia Hospital and the attending physicians under the District of Columbia's Wrongful Death and Survival statutes, D.C.Code §§ 16–2701, 12–101 (1981), on behalf of the decedent's estate and her surviving children.

In preparation for trial, appellants contacted two medical experts who advised them of the need for an OB/GYN expert to review the medical records. Dr. Harold Hirsh, an area specialist in internal medi-

cine and a lawyer, reviewed the decedent's medical records and requested that appellants obtain information from Dr. Brian Blackbourne, who had conducted an autopsy. Dr. Blackbourne advised appellants that an OB/GYN expert needed to determine the progression of the emboli which occluded the pulmonary artery and caused death. After reviewing the records and the information obtained from Dr. Blackbourne, Dr. Hirsh determined that the attending physicians had failed to conform their treatment to the standard of care, but advised appellants that he was also going to have the medical records reviewed by an OB/GYN. Dr. Hirsh also agreed to serve as an expert witness and to testify on Swann's behalf in the medical malpractice action. In addition, Dr. Hirsh offered to. assist appellants in locating an OB/GYN specialist to testify on Swann's behalf. Dr. Hirsh later informed appellants that he would no longer be able to serve as their expert witness.

Appellants' subsequent efforts to retain an OB/GYN specialist proved unavailing, and by the summer of 1978, they were still without an expert witness. In light of the January, 1979, trial date, appellants retained Dr. Dimitroff. After Dr. Dimitroff was deposed in October, 1978, appellants concluded that her testimony undermined the claim of medical malpractice because Dr. Dimitroff had failed to consider certain aspects of the decedent's past medical history in making her initial assessment of the case, and, on cross-examination, had acknowledged that the doctors were justified in performing surgery when they did.

Appellants and Swann decided nonetheless to proceed with the deposition of the defendant physicians, Dr. Booker and Dr. Turner, and thereafter appellants requested a continuance of the January 9, 1979, trial date. The trial was rescheduled to July 30, 1979, with a backup date of April 30, 1979.

Beginning in January, 1979, appellants explored the possibility of settling the

---

1. The inferior vena cava is the vein which carries blood from the abdominal and pelvic areas and empties into the right atrium of the heart. W. DORLAND, DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1443 (26th ed. 1981).

medical malpractice case. On April 10, 1979, they advised Swann that the defendants were willing to settle only for funeral expenses and the costs of litigation. They further informed Swann that because the trial was set for April 30, 1979, it would be necessary to have Dr. Dimitroff travel from Nevada to testify if no settlement could be reached. Appellants acknowledged that Dr. Dimitroff's deposition could be presented as evidence of the claim of malpractice, but advised Swann that, in their view, Dr. Dimitroff's live testimony would be more effective. They told Swann that the doctor's fee for testifying was $2,500. Appellants also advised Swann that as a result of their interview with Dr. William Jaffurs, the chief pathologist at the Columbia Hospital, who had consulted during the decedent's surgery, they were convinced that there had been no medical negligence. They therefore recommended that Swann settle the case. Swann told them she did not want to settle and wanted a continuance of the trial date so she could get the money for the doctor's fee.

After this meeting, there appears to have been a breakdown in communications between appellants and Swann. Two weeks later, and six days before trial, on April 24, 1979, Swann, appellants, and counsel for the defendant physicians appeared in the Superior Court before Judge Norma Holloway Johnson. Appellant Steven told Swann that the judge had denied a request for a continuance, and appellants moved to withdraw their appearance as counsel for Swann. Judge Johnson referred the matter to Judge William Stewart, with whom Swann and appellants, outside of the presence of defense counsel, discussed the status of the case. After this conference, they returned to court and Swann informed Judge Johnson that because she had no other choice at this point, she had reluctantly consented to have the case dismissed with prejudice in return for payment of approximately $2,200, representing funeral and out-of-pocket expenses. Accordingly, a praecipe of dismissal was entered. Swann signed the praecipe, as did appellant Waldman in his capacity as her counsel. Judge

Johnson never ruled on appellants' motion to withdraw.

Appellants were later contacted by appellee Levine and informed that he intended to seek to have the dismissal set aside. By letter dated May 16, 1979, Levine requested that appellants execute a praecipe formally withdrawing their representation so that he could enter his appearance as Swann's attorney and move to set aside the dismissal; attached to Levine's letter was a letter from Swann discharging appellants as her counsel. Appellants executed a praecipe and sent it to Levine, but the praecipe apparently was never filed with the court. Appellants later learned that the praecipe had never been filed and that Levine had never entered his appearance as Swann's attorney. In November, 1980, Swann sued appellants for legal malpractice.

### B.

*The Legal Malpractice Action.* In the legal negligence action, Swann alleged that appellants had breached their fiduciary duty to her, fraudulently misrepresented both their investigation and the status and quality of the medical malpractice action, and had negligently failed to prosecute her case with diligence. She relied on evidence that appellants had failed to consult with an OB/GYN expert before recommending that she settle her case for expenses, had failed to obtain an economist to prepare and testify about the damages resulting from her daughter's wrongful death, and had failed fully to advise her of her options and unjustifiably refused to seek the continuance that she had requested.

Before trial, appellants filed a third-party complaint against Levine alleging that Swann's damages were caused by Levine's negligent failure to take the steps necessary to have the dismissal set aside. Levine moved to dismiss the complaint. After a hearing, Judge Revercomb granted the motion, ruling that the third-party complaint failed to state a claim upon which relief could be granted since appellants had not been the intended beneficiaries of Levine's legal services, the injury allegedly caused by Levine was distinct from that

allegedly caused by appellants, and public policy precludes any claim for contribution or indemnification because of the potential conflict of interest it would create in the representation of a plaintiff by successor counsel.

At trial, Swann presented the testimony of attorney Thomas P. Meehan as an expert on the standard of care for lawyers in wrongful death and medical malpractice cases. Meehan stated that in formulating his opinion as to the appropriate standard of care, he had considered certain provisions of the Code of Professional Responsibility for lawyers. Meehan testified that in failing to consult an OB/GYN specialist in preparing the medical malpractice case, appellants' conduct fell below the minimum standard of care for attorneys in medical malpractice cases. In his view, consultation with an OB/GYN was essential in order to get an opinion with respect to an obstetrical/gynecological problem, that is, what happened during the care of the decedent by obstetricians and gynecologists. He acknowledged that appellants could have retained a doctor or service, or asked a doctor on a medical faculty of a university, to pursue discussions with OB/GYN's, but he emphasized that there would need to be a full report as well as discussions with the OB/GYN by someone who understood the legal standard.

Meehan also testified that in his opinion the standard of care required that an economist or similarly situated expert, such as a home-care provider, testify in the wrongful death/survival action on the economic loss suffered by the decedent's estate and her minor children. The pecuniary loss would involve calculation of the value of the future loss of provider services and future net accumulations by the estate if the decedent had lived out a normal life, both discounted to present value. In his experience, attorneys in all wrongful death/survival cases in the District of Columbia would have an economist testify.

The jury returned a verdict for Swann in the amount of $643,493.88. Judge Wagner denied appellants' motion for judgment notwithstanding the verdict or in the alternative for a new trial.

## II.

### A.

Appellants first argue that the trial court improperly permitted Swann's legal expert to testify that their failure to consult or secure expert testimony from an OB/GYN specialist and from an economist violated the standard of care for attorneys in medical malpractice/wrongful death cases. Appellants contend that caselaw in the District of Columbia has established that the standard of care for attorneys in medical malpractice actions does not require that an attorney retain a medical expert witness having the same specialization as the medical malpractice defendant. They assert that in the District a physician may testify as a medical expert even if he is not a specialist in the particular field of which he speaks. *See Kosberg v. Washington Hospital Center, Inc.,* 129 U.S.App.D.C. 322, 324, 394 F.2d 947, 949 (1968); *Baerman v. Reisinger,* 124 U.S.App.D.C. 180, 181, 363 F.2d 309, 310 (1966); *Sher v. DeHaven,* 91 U.S.App.D.C. 257, 262, 199 F.2d 777, 782 (1952), *cert. denied,* 345 U.S. 936, 73 S.Ct. 797, 97 L.Ed. 1363 (1953). Therefore, they argue, because their presentation of Dr. Dimitroff's testimony would have presented a legally sufficient case of negligence, their handling of the medical malpractice action *a fortiori* conformed to the standard of care. They view the standard of care as irrelevant to consultations that do not provide the basis for testimonial evidence.

■ Appellants' argument misconceives the issue before us. The question is not whether Dr. Dimitroff's testimony would have withstood the test of admissibility or would have permitted appellants to present a *prima facie* case of medical negligence. Rather, the question is whether appellants' conduct of the lawsuit met the standard of care for attorneys in medical malpractice/wrongful death actions. Our prior cases have applied a single standard of care in all negligence actions. *O'Neil v. Bergan,* 452 A.2d 337, 341 (D.C.1982) (citing *Morgan v. District of Columbia,* 449

A.2d 1102, 1108–09 (D.C.1982)). The requisite care is that which a reasonably prudent person would have exercised under the same or similar circumstances. *Morrison v. MacNamara,* 407 A.2d 555, 560 (D.C. 1979). This standard is equally applicable to actions involving negligence by professionals, such as attorneys and physicians. *O'Neil v. Bergan, supra,* 452 A.2d at 341; *Morrison v. MacNamara, supra,* 407 A.2d at 561. "[T]heir conduct must comport with that degree of care reasonably expected of other medical [or legal] professionals with similar skills acting under the same or similar circumstances, *i.e.,* they must adhere to the standard of reasonable care." *Morrison v. MacNamara, supra,* 407 A.2d at 561.

The injury in the instant case was caused shortly after the decedent gave birth to a child while she was under the care and treatment of obstetricians and gynecologists. The medical experts whom appellants consulted advised of the necessity of consulting with experts in these medical fields. Yet no consultations occurred over more than a three year period. To suggest that under these circumstances a jury could not reasonably find that an attorney preparing a medical malpractice case was negligent if the attorney failed to consult with an OB/GYN, or failed to be certain as to the nature of any other specialists' consultations with an OB/GYN, prior to recommending that the client settle for costs, strikes us as a manifestly untenable position, particularly when appellants' own legal expert testified that his notes of their conversations indicated that appellants recognized the need to consult with such an expert. As the court held in *Swann v. Waldman,* 465 A.2d 844 (D.C. 1983), in reversing the grant of summary judgment, whether the failure to consult an OB/GYN breached the attorney's standard of reasonable care to the client presented a

factual issue. A jury finding of negligence does not, as appellants urge, interfere with the attorney's exercise of professional judgment, but rather is a determination that there are minimum actions required of any attorney in the exercise of reasonable care in these circumstances; nor is such a finding at odds with the principle that the selection of one among several reasonable courses of action does not constitute malpractice. *See Rosner v. Paley,* 65 N.Y.2d 736, 738, 481 N.E.2d 553, 554, 492 N.Y.S.2d 13, 14 (1985).[2]

If the judgment is allowed to stand, appellants argue, this court will be imposing a *per se* rule that attorneys in medical malpractice actions must obtain testimony from a medical expert having the same specialization as the medical malpractice defendant, or the attorneys will necessarily be liable to their clients for negligence. Our holding will have no such effect, nor could it.

First, Swann's legal expert testified about the necessity for certain OB/GYN pretrial consultations in order to prepare for the trial of the medical malpractice case, and not about who should testify at trial. Although appellants' medical expert testified that in view of the decedent's symptoms there was an overlap between the medical specialties that would be concerned with her diagnosis and treatment, and Meehan agreed that an internist's testimony was appropriate, one thrust of Swann's case was that appellants had failed to consult with an OB/GYN in preparing for trial. Appellants' own legal expert witness, Kenneth Mundy, Esq., while testifying that he thought appellants met the standard of care in handling the medical malpractice case, referred to appellants' submission of the decedent's medical files to "an OB/GYN specialist for sort of a screening opinion or an opinion with re-

2. The cases cited by appellants in support of their contention that mere good-faith differences of professional judgment do not give rise to an action for negligence are inapposite. *Fishow v. Simpson,* 55 Md.App. 312, 462 A.2d 540 *(1983),* holds only that counsel's trial tactics are not a basis for a malpractice action. *Id.* at 322–23, 462 A.2d at 546. In *Rorrer v. Cooke,* 313

N.C. 338, 329 S.E.2d 355 (1985), the court affirmed the grant of summary judgment in a legal malpractice action where the affidavit of plaintiff's expert failed either to establish the standard of care or to state that defendant's conduct had violated that standard. *Id.* at 356–57, 329 S.E.2d at 366–67.

spect to whether there was underlying medical malpractice." But Mundy noted that appellants had never received an opinion from the OB/GYN doctor. Furthermore, Mundy also testified that it was his impression that appellants knew they needed to consult with an OB/GYN in preparing their case and to back up Dr. Dimitroff. Under these circumstances Mundy thought "they should have gotten an OB/GYN." Thus, based on the evidence before it, the jury reasonably could find, as the trial court noted in denying appellants' motion for judgment notwithstanding the verdict, that the failure to consult alone indicated an inadequate medical workup of the case prior to recommending a settlement for expenses and was a dereliction of appellants' duty to Swann to exercise reasonable care. Appellants' contention that an attorney's conduct as to consultations not leading to trial testimony falls outside the scope of the reasonable care standard as a matter of law is mistaken since such consultations may affect how the case is to be tried and who should testify at trial, and it is a fundamental principle that the attorney's duty to the client extends to pretrial preparation. *See O'Neil v. Bergan, supra,* 452 A.2d at 342. Nothing in *Baerman v. Reisinger, supra,* on which appellants rely, is to the contrary.

Second, our holding remains faithful to the single negligence standard of reasonable care under the circumstances. In *O'Neil v. Bergan, supra,* we held that the expected degree of reasonable care and skill appropriate to the particular case was a matter to be established for the trier of fact through the use of expert testimony. 452 A.2d at 341. Thereafter in *Hamilton v. Needham,* 519 A.2d 172 (D.C.1986), we recognized that some situations did not require expert testimony on the standard of care and that an attorney's negligence could be established as a matter of law. *Id.* at 175 & n. 6. Insofar as appellants

complain about Meehan's testimony, however, the standard of care to be exercised by appellants was a matter for jury determination based upon the testimony of experts presented at the trial. *See O'Neil v. Bergan, supra,* 452 A.2d at 342 (quoting Standardized Civil Jury Instructions for the District of Columbia, No. 9–5 (1981)). While the general standard of conduct is an invariable legal rule—it requires an attorney to exercise that degree of reasonable care and skill expected of members of the legal profession under the same or similar circumstances, *see Morrison v. MacNamara, supra,* 407 A.2d at 561—the specific standard of conduct required under a given set of factual circumstances is a question to be answered by the trier of fact on a case-by-case basis with the assistance of expert testimony, in most instances, adduced at trial. *See Hamilton v. Needham, supra,* 519 A.2d at 174; *O'Neil v. Bergan, supra,* 452 A.2d at 341.[3]

Moreover, expert testimony is not binding on the trier of fact, *Hughes v. Pender,* 391 A.2d 259, 263–64 (D.C.1978), and the trier of fact is given considerable latitude in determining the weight to be given to such evidence. *d.* Therefore, an expert's testimony as to the standard of care does not conclusively establish the standard of care; it is only evidence of that standard. *Cf. District of Columbia v. Barriteau,* 399 A.2d 563, 569 (D.C.1979) (expert economic testimony on impact of future inflation is only evidence of future inflationary trends). The expert may, of course, be cross-examined and his testimony may be rebutted by that of other experts. *Id.*

Accordingly, we find no error by the trial court in permitting Meehan to testify that in his opinion the standard of care for attorneys in medical malpractice/wrongful death actions required consultation with an OB/GYN specialist. Meehan did not testify that the standard required appellants to

---

**3.** As explained by Prosser, the *general* standard of conduct "is a legal rule, from which the jury are not free to deviate, it is a matter of law, and is to be applied by the court." W. KEETON, D. DOBBS, R. KEETON, & D. OWEN, PROSSER & KEETON ON THE LAW OF TORTS § 37, at 236 (5th ed. 1984) (hereinafter PROSSER & KEETON). Because of the infinite variety of circumstances which may arise, it is impossible for courts to prescribe in advance *specific* standards of conduct establishing the particular standard of care in every given situation. Thus, the details of the standard of care must be filled in in each case. PROSSER & KEETON, *supra,* § 37, at 237.

present an OB/GYN witness at trial. In any event, Meehan's testimony was nothing more than evidence of the standard of care. Appellants were entitled to cross-examine him and to present contrary expert testimony of their own, and they did both. Appellants may disagree with Meehan's opinion of what the standard of care required, and the jury apparently accepted his assessment, but their disagreement presents no grounds for reversal.

### B.

For similar reasons we reject appellants' argument that the trial court erred in permitting Meehan to testify to the need for an economic expert witness at trial of the wrongful death and survival claim.

This court has observed

that arriving at a sum representing future loss of earnings often involves a complicated procedure. To arrive at a reasonable figure the trier-of-fact must have evidence pertaining to the age, sex, occupational class, and probable wage increases over the remainder of the working life of the plaintiff. For this reason, ... "the task of projecting a person's lost earnings lends itself to clarification by expert testimony because it involves the use of statistical techniques and requires a broad knowledge of economics."

*District of Columbia v. Barriteau, supra,* 399 A.2d at 568 (quoting *Hughes v. Pender,* 391 A.2d 259, 262 (D.C.1978)). Given this observation it is not surprising that the expert witness on medical malpractice and wrongful death cases testified that appellants' failure to have an economic expert witness on behalf of Swann in her case against the Hospital constituted a failure to meet the standard of care required under the particular circumstances.[4] In Meehan's

opinion, the standard of care required use of an economic expert or the equivalent to calculate the damages and he explained the reasons for his conclusion. Appellants were free to point out the error of his opinion through cross examination and presentation of their own expert witness, and they did. The trial court properly instructed the jury that the law did not require an economist or similar expert to testify in Swann's case, and that the issue before it was whether appellants had breached their standard of care under the circumstances.[5]

### C.

Appellants further object to the trial court's admission of Meehan's testimony that he had considered various provisions of the Code of Professional Responsibility for Lawyers in determining what was the appropriate standard of care for an attorney in appellants' circumstances. Appellants contend that because the Code provides no private cause of action for its violation, any testimony about it was both irrelevant to appellants' liability for negligence and extremely prejudicial.

Although it may be true that the Code provides no private cause of action for its violation, *see, e.g., Bickel v. Mackie,* 447 F.Supp. 1376, 1381 (N.D.Iowa), *aff'd,* 590 F.2d 341 (8th Cir.1978); *Ayyildiz , v. Kidd,* 220 Va. 1080, 1084–86, 266 S.E.2d 108, 112 (1980), a question we need not decide, the issue is whether the standards set by the Code are relevant to establishing the standard of care governing an attorney's conduct. A number of courts have held that although the Code does not attempt to delineate the boundaries of civil liability for the professional conduct of attorneys, its provisions constitute some evi-

---

4. The decedent was a twenty-five-year-old mother of four young children so that her "occupational class" until her death had essentially been that of a parent and her employment history was limited. Hence, her future earnings would be difficult to forecast and compute. Appellants' factual assertion, as grounds for their contention that there was no need for an economic *expert* witness since the decedent had never been employed, is incorrect; she had several jobs, including one with a federal agency. Their own legal expert's testimony, that the tes-

timony of an economic expert "might not be justified" (if the decedent was unemployed or had menial or very low paying jobs) was based on a similar erroneous factual premise.

5. Appellants' contention that the evidence of economic damages is entirely speculative was not raised below and cannot be raised for the first time on appeal. *Chase v. Gilbert,* 499 A.2d 1203 (D.C.1985).

dence of the standards required of lawyers. *See Woodruff v. Tomlin,* 616 F.2d 924, 936 (6th Cir.), *cert. denied,* 449 U.S. 888, 101 S.Ct. 246, 66 L.Ed.2d 114 (1980); *Menzel v. Morse,* 362 N.W.2d 465, 471 (Iowa 1985) (Code is evidence of requisite skill and knowledge of members of legal profession) (dictum); *Martinson Bros. v. Hjellum,* 359 N.W.2d 865, 875 (N.D.1985) (Code violations constitute rebuttable evidence of legal malpractice); *see also Van Horn Lodge, Inc. v. White,* 627 P.2d 641, 645 n. 1 (Alaska 1981) (Rabinowitz, C.J., dissenting). Other courts, although not faced with the precise issue presented here, looked to the Code for guidance on the proper standard of conduct for attorneys. *Lysick v. Walcom,* 258 Cal.App.2d 136, 146–47, 65 Cal. Rptr. 406, 413 (1968); *Ishmael v. Millington,* 241 Cal.App.2d 520, 526–27, 50 Cal. Rptr. 592, 595–96 (1966); *Crest Inv. Trust, Inc. v. Comstock,* 23 Md.App. 280, 302, 327 A.2d 891, 904–05 & n. 10 (1974); *Hansen v. Wightman,* 14 Wash.App. 78, 93–98, 538 P.2d 1238, 1249–51 (1975) (disciplinary rules have status of rule of court).

It is an obvious proposition that the Code of Professional Conduct provides a gauge by which to determine the competency of the Bar. *See* Preamble and Preliminary Statement to Code of Professional Responsibility, D.C. Court Rules Annotated (1987) Appendix A, at 133–34. *See also* D.R. 6–101(A)(1) & (2) (lawyer shall not handle legal matter which he knows he is not competent to handle or undertake representation without preparation adequate in the circumstances). A legal expert's use of the Code in determining the standard of care required in a legal malpractice case is not unlike the use of practice codes in other negligence contexts. *See, e.g., Leiken v. Wilson,* 445 A.2d 993, 1002 (D.C.1982) (traffic regulations); *Bowman v. Redding & Co.,* 145 U.S.App.D.C. 294, 301–02, 449 F.2d 956, 963–64 (1971) (industrial safety board regulations); *Menzel v. Morse, supra,* 362 N.W.2d at 471 n. 4 (private safety code, maintenance manual). The testimony

in the instant case was extremely limited in scope. Meehan did not testify that the appellants had violated the provisions he cited and expressed no opinion at all upon that question. He merely stated that certain Code provisions had served as guides in his determination of the standard of care. We hold that this testimony was properly admitted.

### III.

■ Appellants next challenge the factual and legal sufficiency of Swann's evidence. They assert that Swann failed to prove that she would have prevailed in the underlying medical malpractice action, and that therefore she is precluded from recovery in the suit for legal malpractice. *Niosi v. Aiello,* 69 A.2d 57, 60 (D.C.Mun.App. 1949). Appellants attack the testimony of Swann's medical expert, arguing that it was based upon serious factual errors. They contend that the decedent's death could not have been caused by manipulation of the blood clot mass during surgery because she experienced no distress until twenty to twenty-five minutes after removal of the mass, and the evidence showed that emboli travel through the circulatory system in a matter of seconds and that death from a pulmonary embolism occurs immediately. The defendants in the medical malpractice action presented expert testimony that a single embolus would take only a few seconds to travel through the circulatory system. Dr. Blackbourne testified that the autopsy revealed multiple emboli in the decedent's lungs and that the cause of decedent's death was a massive pulmonary embolism. None of the experts, however, commented on the relationship of the rate of travel of multiple emboli to the time of death. It was thus for the jury to consider the weight to be given to the expert's testimony, *Hughes v. Pender, supra,* 391 A.2d at 264, and it apparently credited the testimony of Swann's expert as to the cause of death.[6]

■ Appellants also contend that Swann's expert erroneously testified that

**6.** Appellants also contend the trial court erred in refusing to permit appellants' counsel to ask Dr. Crane a hypothetical question regarding the decedent's prognosis if certain medical advice

had been followed. The trial court noted that there was a foundation problem for at least part of the hypothetical question, and counsel agreed to eliminate one part of the question. It ap-

once the attending physicians discovered the mass, they ought to have taken precautionary measures before removing it. One such measure was the clamping of the inferior vena cava in order to prevent emboli from travelling to the lungs. The clamping would have had to be performed at a precise location, above the point where the right ovarian vein enters the inferior vena cava. Appellants argue that this clamping could not have been accomplished because the ovarian vein was only one centimeter below the renal vein. Thus, clamping the vena cava would have obstructed the flow of blood to the kidneys. However, Dr. Blackbourne testified that the location of veins varies from person to person. In addition, since there was a conflict in the expert testimony as to the location of the veins and since the body's venal structure is beyond the experience of the average layperson, it was the province of the jury to resolve the conflict in the testimony.[7]

## IV.

Finally, appellants contend that their third-party complaint against Levine was improperly dismissed. They argue, in essence, that Levine's negligence in failing to have the dismissal set aside was either an intervening or contributing cause of Swann's injuries. Specifically they contend that Levine prevented them from taking any action after Swann changed her mind about settlement and that Swann's injury was not established until the time had passed during which action could have been taken to set aside the settlement and vacate the dismissal order.

 No court in this jurisdiction has yet had occasion to consider the potential liability of successor counsel to predecessor counsel for indemnification or contribution of damages caused to a client by the successor counsel's alleged negligence. In other jurisdictions the courts have focused on whether the client's injury continues to accrue after successor counsel takes over the client's case, whether the action to be taken by successor counsel is mandated and counsel fails to act, or whether the action involves a choice among alternatives

pears trial counsel further acceded to the trial court's ultimate ruling disallowing the question, and did not pursue a hypothetical question in the areas the trial court had approved. But even if counsel did not, assuming error, we find no basis for holding that such error warrants reversal.

7. Appellants' contention that the trial court erred in denying their motion for judgment notwithstanding the verdict because Swann failed to present sufficient credible evidence in support of her claim is without merit. As discussed above, Swann presented expert testimony as evidence of the applicable standard of care, and the expert rendered his opinion that appellants' conduct failed to meet that standard. *See Shewmaker v. Capital Transit Co.,* 79 U.S.App.D.C. 102, 103, 143 F.2d 142, 143 (1944). Although the trial court may set aside a verdict where such verdict is against the clear weight of the evidence, *Rich v. District of Columbia,* 410 A.2d 528, 534 (D.C.1979), that decision is committed to the discretion of the trial court and will only be disturbed on appeal if there has been a clear abuse of discretion, *Bedell v. Inver Housing, Inc.,* 506 A.2d 202, 207 (D.C.1986), and we find none.

In addition to the evidence discussed above, Swann offered other evidence of appellants' negligence which they do not contest on appeal. Swann testified without contradiction that she had asked appellants to seek a continuance (in her words an "extension") of the trial date. On the day she arrived at court, just prior to going before Judge Johnson, Swann testified that appellant Steven told her the judge would not grant a continuance. In fact, appellants had never asked for a continuance. Appellant Waldman testified that he raised the possibility of withdrawing with Swann on April 23, 1979, and by withdrawing on April 24, he anticipated that the trial date would be continued, which appellants' legal expert testified probably would have happened. The failure to follow a client's explicit instructions constitutes negligence. *Hamilton v. Needham, supra,* 519 A.2d at 174–75 (citing *O'Neil v. Bergan,* 452 A.2d at 342 (no expert testimony required where "attorney's lack of care and skill is so obvious that the trier of fact can find negligence as a matter of common knowledge.")).

In addition, Swann testified that she was unaware appellants would seek to withdraw as her counsel when they appeared before Judge Johnson six days before the trial date. Meehan testified that appellants' effort to withdraw six days before trial violated the standard of care owed by an attorney to the client since withdrawal from pending litigation should only occur under circumstances that would not prejudice the client. Appellants' legal experts (Kenneth Mundy, Esq. and Jeremiah Collins, Esq.) were of a different opinion, principally because they thought withdrawal would have led the court to continue the trial date.

requiring the exercise of professional judgment. *See Rosner v. Paley,* 116 Misc.2d 454, 464–67, 455 N.Y.S.2d 959, 966 (1982) (and California cases cited), *rev'd,* 99 A.D. 2d 1018, 473 N.Y.S.2d 808 (1984), *reinstated,* 65 N.Y.2d 736, 737, 481 N.E.2d 553, 492 N.Y.S.2d 13 (1985). Where there is a choice to be made, successor counsel has no duty to the client to take action which would lessen the damages resulting from predecessor counsel's negligence, and is not liable to predecessor counsel for contribution. *Roberts v. Heilgeist,* 124 Ill.App. 3d 1082, 1085–86, 80 Ill.Dec. 546, 549, 465 N.E.2d 658, 661 (1984). *See also Hughes v. Housley,* 599 P.2d 1250, 1253 (Utah 1979) (rejecting analogy to the negligent treating physician). The line drawn in these jurisdictions permits successor counsel to act in the client's best interests without concern that a lawsuit will be filed by predecessor counsel for indemnification or contribution. Because we conclude that a client's successor counsel should not be required to choose between a course of conduct which is in the best interest of the client and the course best suited to insulate successor counsel from a third-party complaint by predecessor counsel, we hold that the dismissal was proper.[8]

Thinking she had no other choice, Swann reluctantly agreed to the dismissal with prejudice of her complaint against the Hospital upon the advice of her attorneys, appellants.[9] Her relinquishment of such a viable claim constituted the alleged tort which is the subject of this litigation. Thus, the attorney whom Swann contacted subsequent to her dismissal of her wrongful death case could not be deemed to have caused her injury. Swann's injury was in no way aggravated or added to by Levine's alleged negligence. The injury had already occurred when the medical malpractice action was dismissed. Accordingly, the trial court in this case properly dismissed the third-party complaint by appellants against appellee's second attorney.[10]

Appellants contend, however, that if Levine had moved to set the dismissal aside, all of Swann's damages might have been averted. One problem inherent in their contention is the fact that they remained counsel of record for Swann. Although appellant Waldman signed a praecipe withdrawing his appearance and sent it to Levine to file, it was never filed. Under the rules of the court the responsibility to file the praecipe was Waldman's, and not Levine's. Super.Ct.Civ.R. 101(c) (counsel seeking to withdraw appearance must file praecipe or motion with court). Since appellants' motion to withdraw was never acted upon by Judge Johnson at the time of the settlement, they remained Swann's counsel. They clearly recognized this fact when Waldman signed the praecipe of dismissal in his capacity as her attorney. Moreover, Levine never entered his appearance in the case as counsel for Swann. Consequently, since appellants were aware from the moment they first recommended settlement to Swann that it was not what she wanted, it is hardly clear that had appellants offered, prior to Swann's May 16, 1979, letter dismissing them as her

---

**8.** We leave for future resolution whether public policy would prohibit a third-party complaint against successor counsel where successor counsel does not face a choice among alternative courses of action. *Cf. Parker v. Morton,* 117 Cal.App.3d 751, 763, 173 Cal.Rptr. 197, 204 (1981) (third-party complaint permitted where successor counsel's duty did not involve exercise of professional judgment).

**9.** The jury specifically found that Swann's agreement to dismissal of the complaint had not been voluntary.

**10.** Neither of the two cases upon which appellants place primary reliance, *Parker v. Morton, supra* note 8, 117 Cal.App.3d 751, 173 Cal.Rptr. 197 (1981) and *Schauer v. Joyce,* 54 N.Y.2d 1, 429 N.E.2d 83, 444 N.Y.S.2d 564 (1981), is factu-

ally on point. In both of those cases, the client's damages continued to accrue after the client had discharged the first attorney. *See Parker v. Morton, supra* note 8, 117 Cal.App.3d at 761, 173 Cal.Rptr. at 203 (ongoing monthly pension payments); *Schauer v. Joyce, supra,* 54 N.Y.2d at 6–7, 429 N.E.2d at 85, 444 N.Y.S.2d at 566 (ongoing alimony payments). In contrast, in the instant case, Swann's alleged injury was complete at the time of entry of the dismissal order. *See Roberts v. Heilgeist, supra,* 124 Ill.App.3d at 1087–88, 80 Ill.Dec. at 550, 465 N.E.2d at 662 (loss of cause of action because of running of statute of limitations); *Hughes v. Housley, supra,* 599 P.2d at 1253 (client's damages complete upon entry of default judgment).

counsel, to file a motion to set aside the dismissal that Swann would have objected to their doing so. *Cf. Parker v. Morton, supra* note 8, 117 Cal.App.3d at 763 n. 4, 173 Cal.Rptr. at 204 n. 4 (corrective or ameliorative action, such as filing motion for relief from default, required by successor counsel as a matter of law where predecessor attorney discharged and has no authority to take such action when first attorney's negligence was omission resulting in a default against client) (dictum). Thus, appellants themselves, and not Levine, may well have been the cause of the failure to mitigate Swann's damages.

In addition, the chances of having the order of dismissal set aside were uncertain. Super.Ct.Civ.R. 60(b) provides for such relief only in limited circumstances. This court has declined to find evidence of attorney negligence where we would have to speculate about a result, *see Chase v. Gilbert, supra* note 5, 499 A.2d at 1212, and courts in other jurisdictions have declined to extend the independent, successive tortfeasor rationale to situations in which a lawyer must exercise legal judgment in choosing the proper course from among varying alternatives. *Holland v. Thacher,* 199 Cal.App.3d 924, ——, 245 Cal.Rptr. 247, 253–54 (1988); *Gibson, Dunn & Crutcher v. Superior Court,* 94 Cal.App.3d 347, 156 Cal.Rptr. 326 (1979); *Held v. Arant,* 67 Cal.App.3d 748, 134 Cal.Rptr. 422 (1977); *Rosner v. Paley, supra,* 116 Misc.2d at 466, 455 N.Y.S.2d at 966 (declining to extend *Schauer v. Joyce*). Levine would have had to exercise his professional judgment in deciding whether the chances that such a motion would succeed merited the expenditure of client funds. This would have involved an evaluation not only of the likely success of the Rule 60 motion but of the likely success on the merits of the medical malpractice claims as well. His decision was hardly a foregone conclusion even if the proposed course of conduct was in the nature of a "settled professional procedure." *See Rosner v. Paley, supra,* 116 Misc.2d at 466, 455 N.Y.S.2d at 966 (defined as a "risk free act").

The policy reasons for refusing to apply the normal rules of indemnity from a subsequent exacerbating tortfeasor to this situation are persuasive because they flow from the very nature of the relationship between the attorney and the client. Successor counsel's ability to choose the best course for the client should not be influenced by fears of liability for contribution or indemnity. An attorney should not be swayed from making the decision that the attorney thinks is in the client's best interest because another course of action will better serve the attorney's own interest in avoiding a third-party complaint. *Holland v. Thacher, supra,* 199 Cal.App.3d at 932–35, 245 Cal.Rptr. at 252–53; *Gibson, Dunn & Crutcher v. Superior Court, supra,* 94 Cal.App.3d at 356, 156 Cal.Rptr. at 331; *Goldfisher v. Superior Court,* 133 Cal. App.3d 12, 22, 183 Cal.Rptr. 609, 615 (1982); *Held v. Arant, supra,* 67 Cal.App.3d at 752–53, 134 Cal.Rptr. at 424. Such a conflict, the New York and California courts have concluded, and we agree, is "untenable in view of the lawyer's duty of undivided loyalty to [the] client." *Rowell v. TransPacific Life Ins. Co.,* 94 Cal.App.3d 818, 822, 156 Cal.Rptr. 679, 681 (1979); *Rosner v. Paley, supra,* 116 Misc.2d at 467, 455 N.Y.S.2d at 967 ("The conflict would deprive the client of [the] right to the undivided faithful professional representation of lawyer II or would require lawyer II to withdraw from the litigation and thus subject the plaintiff-client to harm by requiring the substitution of new counsel.").

Accordingly, the judgment is affirmed.[11]

**11.** Because we conclude that the complaint against Levine was properly dismissed, we do not reach appellants' challenge to the directed verdict on the issue of intervening cause.