NATIONAL HEALTH LABORATORIES,
INC., Appellant,

v.

Pari AHMADI, et al., Appellees.

The NEUROLOGY CENTER,
P.A., Appellant,

v.

Pari AHMADI, et al., Appellees.

Nos. 89–1247, 89–1305.

District of Columbia Court of Appeals.

Argued Feb. 28, 1991.
Decided Sept. 4, 1991.

J. Joseph Barse, with whom David P.
Durbin and Jayson L. Spiegel, Washington,

D.C., were on the brief, for Nat. Health Laboratories, Inc.

Angus R. Everton, with whom Roy L. Mason, Baltimore, Md., was on the brief, for The Neurology Center, Inc.

Michael B. Waitzkin, with whom Lori E. Fox, Washington, D.C., was on the brief, for Pari Ahmadi.

Before FERREN, STEADMAN and FARRELL *, Associate Judges.

STEADMAN, Associate Judge:

The plaintiff in this litigation suffered permanent paralysis as a result of misdiagnosis of her ailment. She brought a malpractice action against the two appellants, one the medical group that was treating the plaintiff and the other a laboratory which improperly conducted a blood test. A jury found both appellants negligent. The principal issue in these consolidated appeals is whether the trial court erred in refusing to hold either appellant solely responsible for the judgment, either by way of indemnification or superseding cause as a matter of law, and instead imposing on each appellant an equal, fifty percent contribution to the judgment. We affirm.

I

On June 30, 1986, Pari Ahmadi, the plaintiff below and appellee in the instant appeals, came to the Neurology Center (the "NC") with a history of numbness in her lower extremities and other symptoms. She was about thirty years old. Her first NC physician, Dr. Elliott Wilner, performed an examination which led him tentatively to conclude that Ahmadi suffered from a spinal cord lesion caused either by (1) vitamin B–12 deficiency;[1] (2) multiple sclerosis ("MS"); or (3) mass lesion from a tumor or ruptured disk.

To narrow the diagnosis, Wilner ordered various tests, including a vitamin B–12 level test to rule out B–12 deficiency. Although Wilner was quickly able to exclude the tumor or ruptured disk alternatives, he could not so easily exclude either MS or B–12 deficiency by the other tests that the NC administered. Since the NC did not have the capability to perform the vitamin B–12 level test on Ahmadi, blood was drawn on July 7 and sent to the National Health Laboratories (the "NHL") for such a test. The NHL conducted the B–12 test on July 8. Because of an admitted error in the testing methodology, the NHL technicians incorrectly reached a normal-range finding,[2] which was accordingly reported to Dr. Wilner and the NC on July 11.

On July 8, Ahmadi had been admitted to George Washington University Hospital ("GW") by another NC physician, Dr. Phillip Pulaski, for further workups due to increased symptomatology. On admission, a GW resident ordered a second vitamin B–12 level test, unaware of the first apparently normal result which had not yet been reported to Wilner and the NC. The hospital staff never carried out the new test, and Pulaski testified that he relied on the normal-range result of the NHL's test to rule out B–12 deficiency; he thereby made the probable diagnosis of MS.[3] Pulaski did admit, however, that her symptoms were consistent not only with MS but also with B–12 deficiency.

Ahmadi marginally improved with outpatient treatment by the NC's Dr. Richard Edelson from the end of July to November, when she worsened again. The NC again

---

* Associate Judge FARRELL was selected as a member of the division to replace Associate Judge SCHWELB, who recused from this case after oral argument.

1. Vitamin B–12 deficiency can result in severe and irreparable degeneration of the nerves, including the spinal cord, if unchecked, but the disease process may be halted entirely, or at least substantially interrupted, by timely vitamin injections.

2. One of Ahmadi's experts testified that the true reading at the time would have been dangerously lower than the normal-range result reported by the NHL.

3. There was also evidence that the NC physicians relied on Ahmadi's age, nationality, the rarity of B–12 deficiency disease, and the fact that she improved while in the hospital, which would be unexpected with true B–12 deficiency, in forming their impression that Ahmadi had MS.

ruled out vitamin B–12 deficiency without conducting a new B–12 level test, instead suggesting risky drug treatment for MS. Finally, in February, while on a trip to see her sister in California, Ahmadi suffered a serious bladder infection for which she went to see Dr. Bruce Spertell at Stanford University Medical Center. Over the next few days, she became much weaker, and, on the verge of paralysis, went to Stanford on an emergency basis, again seeing Dr. Spertell. Spertell diagnosed B–12 deficiency even before the results of a new B–12 test came back at a dangerously low level. Ahmadi has remained paralyzed from the waist down ever since.

Ahmadi brought suit against the NC for negligence and medical malpractice; against the NHL, for negligent failure to perform the B–12 test properly and for falsely reporting a normal result; and against GW for negligence in failing to complete a second B–12 test and failure to diagnose. The jury exonerated GW, but found for Ahmadi as against the NC and NHL, rendering a $10 million verdict against both. Previously filed cross-claims for contribution and indemnity by each liable defendant against the other were argued in a bench hearing. The trial court ruled that while each was entitled to contribution of 50% from the other, neither was entitled to indemnification under District law. The NC has since settled its share of the judgment with Ahmadi.

## II

In its appeal, the NC challenges the trial court's refusal to order the NHL to indemnify it for its half share of liability for Ahmadi's injuries. The NC argues that

indemnification by the NHL is required as a matter of law.

At common law, there existed no right of contribution between joint tortfeasors who contributed to a single injury, and until the passage of specific statutes about twenty years ago, the great majority of American courts followed this rule. The District of Columbia, however, was one of nine American jurisdictions to come to the contrary conclusion without legislation. W. Prosser, D. Dobbs, R. Keeton, & D. Owen, Prosser and Keeton on the Law of Torts § 50, at 336–37 (5th ed. 1984) (hereafter "Prosser"). In *Knell v. Feltman*, 85 U.S.App. D.C. 22, 174 F.2d 662 (1949), the court rejected the common law rule and permitted contribution in such circumstances.

■ Thus, ordinarily, when two tortfeasors jointly contribute to harm to a plaintiff, both are potentially liable to the injured party for the entire harm. As between themselves, however, through the principle of contribution, they share equally[4] in satisfaction of the judgment.[5] *See Group Health Ass'n v. District of Columbia General Hosp.*, 540 A.2d 1104 (D.C.1988); *Ceco v. Coleman*, 441 A.2d 940 (D.C.1982). Such equal contribution by the NHL and NC was what the trial court ordered here, from which they both appeal.

Under certain circumstances, however, a trial court may require that one of the two tortfeasors bear, as against the other, sole responsibility for satisfaction of the judgment. One of the common bases for such a right of indemnity is the existence of an express contractual duty to indemnify.[6] Another is where one is held responsible solely by operation of law because of a relation to the original wrongdoer, such as the liability of an employer for acts of his

---

**4.** Since we do not have in this jurisdiction any principle of comparative fault, no attempt is made to assess the respective amount of contribution through a theory of comparative negligence. *See, e.g., In re Air Crash Disaster at Washington, D.C.,* 559 F.Supp. 333, 351 (D.D.C.1983), *aff'd,* 275 U.S.App.D.C. 403, 866 F.2d 1521 (1989); *Early Settlers Ins. Co. v. Schweid,* 221 A.2d 920 (D.C.1966).

**5.** The Restatement (Second) of Torts § 886A (1965) describes the principle thus: "When two

or more persons become liable in tort to the same person for the same harm, there is a right of contribution among them, even though judgment has not been recovered against all or any of them." It then provides for several exceptions to the rule.

**6.** Since neither party disputes that "there exists no such contractual provision in the case before us, we need not further discuss the issue." *Myco v. Super Concrete,* 565 A.2d 293, 297 (D.C.1989).

employee or an owner of an automobile for acts of the driver. Likewise, one who is wrongfully directed or induced by another to do the negligent act may be entitled to indemnity from the other. PROSSER, *supra*, at 341–42.

■ It may be seen from these examples that the right to indemnity depends essentially upon the relationship between the parties, which may be expressly contractual or may be such that an obligation to indemnify, in a sense quasi-contractual in nature,[7] may be fairly imposed. So it is that while indeed a right to indemnity may extend to those personally at fault, it is granted in such circumstances normally only where "a duty to indemnify may ... be implied 'out of a relationship between the parties,' to prevent a result 'which is regarded as unjust or unsatisfactory.' " *East Penn Mfg. Co. v. Pineda*, 578 A.2d 1113, 1126 (D.C.1990), quoting from *Myco*, *supra* note 6, 565 A.2d at 297. As noted in *Myco*, this concept in the main "is based on the well-established theory that if one [tortfeasor] breaches a duty owed to another and the breach causes injury, the former should compensate the latter." 565 A.2d at 298. "In order to establish the right to this particular type of implied indemnity, the obligation must arise out of a specific duty of defined nature—separate from the injury to the [plaintiff]—owed to the third party ...," and there must be evidence of a special legal relationship between the tortfeasors. 565 A.2d at 299.[8] The fact that one joint tortfeasor was more or less actively negligent than the other does not alone warrant indemnification. We have rejected the "active/passive" theory of implied indemnity. *Myco*, 565 A.2d at 298–99; *East Penn*, *supra*, 578 A.2d at 1127 n. 20.[9]

We have recently upheld an award of implied indemnity flowing from a relationship between the parties involving justified reliance where the joint tortfeasors stood in a manufacturer-retailer relationship. *See East Penn*, *supra*, 578 A.2d 1113.[10] There, we found an implied duty on the manufacturer of a battery to indemnify the retailer where the retailer's "only fault" was to rely on the manufacturer's skill and experience in its duplication of the wording of the manufacturer's warning label.

■ The NC contends that the same principle entitles it to indemnification. It argues that the NHL "had a critical relationship with the [NC] which pre-existed its negligence, and which gave rise to a duty ... to render accurate, complete information regarding Pari Ahmadi's blood test results" to the NC. The NC then argues

---

**7.** "Indemnity ... sounds in contract and is founded not on either party's obligation to the victim, but on the indemnitor's obligation to the indemnitee (distinct from their coincident obligations to the victim)." *Eagle–Picher Industries, Inc. v. United States*, 937 F.2d 625, 635 (D.C.Cir. 1991).

**8.** As noted in *East Penn*, concepts of "special relationship" and "independent duty" have been subject to some criticism as simply stating the problem and should not "obfuscate what ultimately is a principle of equity," based, according to the Restatement, ultimately on restitution and unjust enrichment. 578 A.2d at 1127–28 & n. 20, citing RESTATEMENT (SECOND) OF TORTS, *supra* note 5 § 886B, comment c. Nonetheless, these concepts are useful in giving some context for application of what otherwise could be a rather formless doctrine.

**9.** In *East Penn*, we took note of the summary formulated in PROSSER, *supra*, at 344, that in addition to "the relation of the parties to one another, and the consequent duty owed," indemnification may be based on "a significant differ-

ence in the kind or quality of their conduct." Where the latter concept has utility remains to be seen. At the least, we think that the difference in "kind" or "quality" would be more distinct than that in the case before us. Since we have not adopted any principle of comparative negligence, a considerable differential between the quantum of negligence cannot warrant indemnification. It is worth remembering that indemnification developed as an equitable principle at a time when no contribution was recognized at all, as discussed above, so that the choice was all or nothing. The older cases granting indemnification must be read with that in mind. *See* RESTATEMENT (SECOND) OF TORTS, *supra* note 5 § 886B, comment 1. A similar caution is needed with cases from comparative negligence jurisdictions, where greater flexibility is available.

**10.** Although in *Myco*, *supra* note 6, we identified, in dicta, several examples of other such special legal relationships including those of bailor-bailee, lessor-lessee, and principal-agent, none of them resembles the ordinary contractual situation in the instant case. 565 A.2d at 299.

that the NHL breached this duty to it by failing both to provide a correct test result and to warn it that the test result was unreliable where its employees knowingly failed to follow proper testing protocols.

We think the trial court was correct in rejecting these arguments and concluding that whatever the duty or relationship of the NHL to the NC may have been initially, over time the NC could no longer rely reasonably on the test result. As the trial court found, the NC pursued a "misdiagnosis that initially perhaps was a difficult one ... but which over the passage of time, perhaps soon after the report of the test from the [NHL], should have ... caused [it] to doubt the accuracy of the laboratory result in favor of the clinical symptoms which were consistent with vitamin B–12 deficiency ..." and "the [NC] doctors [were] independently negligent and actively negligent in failing to reopen the whole question of what the correct diagnosis was and to pursue that new inquiry ... by ordering another ... B–12 test." Certainly the different NC neurologists could at least collectively be expected to rely on their own clinical impressions as much as on the expertise of the testers where the B–12 test result itself represented only one piece of the diagnostic mosaic according to the standard of care of the profession.[11]

Neither *East Penn* nor *Myco* entitles the NC to indemnity here.[12] In *Myco*, an employer assertedly had modified certain equipment furnished by Myco which resulted in injury to an employee. We rejected the concept that the user of a product has a responsibility to a manufacturer to use the product in such a way as not to bring liability upon the manufacturer, and that the duty of proper care by the user, the employer in that case, extends solely to his employees. 565 A.2d at 300. That case, involving an unsuccessful attempt by the prior joint tortfeasor to obtain indemnity from the subsequent tortfeasor, implicated the reverse of the NC's efforts here.

*East Penn* does involve a situation in which a subsequent tortfeasor sought indemnity but is clearly distinguishable. The sole involvement of the retailer there was to rely upon the manufacturer's warning label. It had no independent reason to suspect error or impetus to investigate further. Here, the NC was an active and ongoing participant, indeed the chief participant, in the effort to diagnose a mysterious ailment. The NHL's negligent test was only a part of the overall mosaic of the NC's activity. As the trial court reasoned, while the NC may have initially relied on the NHL's duty to provide it with accurate test results, the NC could not properly have relied on these results over the entire seven-month period. Any "independent duty" that the NHL may have had to the NC was thus dissipated for purposes of seeking indemnity.[13]

11. As counsel for the NHL argued at oral argument, the ongoing and lengthy nature of the NC's negligence distinguishes this case from one where, for example, an improper testing procedure missed the presence of a severe bacterial infection and the patient thereby died before the doctors could diagnose and treat the illness from clinical or other indicators. In such a situation, the doctors may have relied reasonably on the laboratory's duty to provide a correct result (or inform them otherwise), assuming, of course, that the clinical symptoms of the patient were consistent with something other than the wrongly diagnosed illness.

12. The NC's reliance on *Air Shields v. Spears,* 590 S.W.2d 574 (Tex.Civ.App.1979), is misplaced. It too involved a manufacturer-seller relationship where there was evidence that the manufacturer had "a duty to warn of dangers in the use of its product" because it "was uniquely situated to appreciate the medical risks inherent in the use of its machine." *Id.* at 578. Here, there was no evidence presented that the NHL had any greater or more sophisticated knowledge or skill in the *use* of its vitamin B–12 tests in actual patient care than the neurologists, whose singular domain it was to reconcile all of the clinical and test evidence in order to reach a diagnosis and deliver treatment. Similarly, reliance on *Board of Trustees v. RTKL,* 80 Md. App. 45, 559 A.2d 805, 810–811 (1989), is inapposite because Maryland still follows the active-passive (or primary-secondary) approach to indemnity law and because that case determined in any event that "indemnity was not precluded nor mandated ... as a matter of law."

13. Appellant also argues that the trial court's factual findings were clearly erroneous because the court (1) failed to address "independent duty," (2) could not locate in time specifically when the negligence of the NC occurred or which NC doctor was negligent, and (3) erred in

The trial court quite properly denied the NC's indemnification claim against the NHL. We now turn to the arguments made by the NHL on appeal.

### III

As appellant, the NHL seeks to avoid any liability on two distinct theories: (1) that the NC's negligence as a matter of law constituted a superseding cause relieving NHL of any liability, and (2) that it is entitled to recovery of a major portion, if not all, of its liability for damages on a theory of indemnity or "apportionment." [14]

### A

The issue of superseding cause was submitted to the jury, which found against the NHL. In its motion for a JNOV, the NHL argued that it had established superseding cause as a matter of law. The trial court disagreed, as do we.

■ We have recently had occasion to discuss the principle of superseding cause and need not repeat it here. In essence, it is a concept that the action of a subsequent tortfeasor may be a "superseding cause" which breaks the chain of causation and relieves the first tortfeasor of liability to the injured party. *McKethean v. WMATA,* 588 A.2d 708, 716 n. 9 (D.C.1991); RESTATEMENT (SECOND) OF TORTS, *supra* note 5 § 440.[15]

The trial court here gave the jury an instruction, without objection by the NHL, which provided in part:

You are instructed that in order to find that the conduct of The Neurology Center or the hospital were intervening causes which would excuse the National Health Laboratory from liability to the plaintiff, you must find two things: First, you would have to find that the acts of The Neurology Center and/or the acts of the hospital were not foreseeable; that is that the conduct of these other actors could not reasonably have been anticipated by the National Health Laboratory and, therefore, that it could not reasonably have been expected to have taken steps to prevent the harm to the plaintiff from its own negligence ... Second, you must find that the intervening acts in retrospect were highly extraordinary.

Superseding cause is a subset of the inquiry into proximate cause. "It is well-settled that proximate cause ... is ordinarily a question of fact for the jury. It is only in cases where it is clear that reasonable [people] could draw but one conclusion from the facts alleged that negligence and proximate cause become questions of law. These cases have been said to be 'exceptional.'" *Hill v. McDonald,* 442 A.2d 133, 137 (D.C.1982) (citations omitted).[16] Thus,

---

finding the doctors "actively negligent." The first two issues are essentially those of law, and were adequately dealt with. There was ample evidence to support the trial court's findings that a "tandem" tort mutually resulted in the harm, and that the NC was "actively" negligent.

**14.** The NHL also contends that the trial court erred as a matter of law in approving the methodology used by Ahmadi's economic expert in his appraisal of Ahmadi's loss of future earnings. Neither party disputes that the effect of both state and federal future taxes should be a part of the future earnings measurement. *See Runyon v. District of Columbia,* 150 U.S.App. D.C. 228, 231, 463 F.2d 1319, 1322 (1972). The expert computed the present worth of future earnings by using a discount rate based on the return on taxable rather than tax-free investment, a method that the trial court viewed as plausibly reflecting a measure of tax impact. Full cross-examination was permitted and the NHL had the opportunity to attempt to qualify

its own expert. We see no error by the trial court in permitting the jury to take into account the expert's methodology. *See Psychiatric Institute of Washington v. Allen,* 509 A.2d 619, 625 n. 8 (D.C.1986) (evidence of lost earnings sufficient where trial court permitted cross-examination of testifying expert and opportunity of defendant to present its own expert testimony); *District of Columbia v. Barriteau,* 399 A.2d 563, 569 (D.C.1979). *Cf. Monessen Southwestern Ry. Co. v. Morgan,* 486 U.S. 330, 342, 108 S.Ct. 1837, 1846, 100 L.Ed.2d 349 (1988).

**15.** The NHL also cites the RESTATEMENT (SECOND) OF TORTS, *supra* note 5 § 452, which treats of a third person's failure to prevent harm. This provision simply shows that passage of time, with other factors, could have justified, but did not compel, a finding of superseding cause.

**16.** The NHL's apparently related argument that proximate cause was insufficiently proven apart from any consideration of superseding cause cannot meet this standard.

a motion for a JNOV on this issue is subject to the rigorous test that such a motion "should be granted 'only in "extreme" cases, in which no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party.'" *Mike Palm, Inc. v. Interdonato,* 547 A.2d 1016, 1019 (D.C.1988).

■ Applying this standard to the evidence presented here in the light of the instructions given to the jury, we find no error in the trial court's denial of the motion. The NHL's claims that the test results were so inconsistent with the patient's condition that the test could not have been foreseeably relied upon is belied by the fact that other indicators pointed to MS, and therefore the normal-range test result could have thrown the NC doctors off an original course which had contemplated B–12 deficiency as a possible culprit. There was ample expert testimony that the NC could have relied on the test. Further, the NC's negligent failure to discover the error over the subsequent months was not necessarily an extraordinary event. We could not deem it unforeseeable as a matter of law that a negligently performed vitamin B–12 deficiency test yielding a false normal result could lead to a negligent failure to diagnose B–12 deficiency. There is simply no basis for us to say that this jury could not reasonably have found the NHL's negligent testing and violation of its own protocol a substantial cause of the harm not superseded by the NC's conduct.

**B**

■ Any indemnity claim by the NHL against the NC must be judged by the same principles applicable to the NC's like claim against the NHL and found wanting for substantially the same reasons. The NHL as a prior tortfeasor can establish no duty imposed on the NC arising out of the relationship. The NC's responsibility ran to the plaintiff to render her competent medical service. There can be no legitimate claim that the NC had a separate duty to the NHL to discover that the NHL had made an error in its blood test. As we said in *Myco, supra* note 6, "imposition of such a duty would stand 'indemnity on its head.'" 565 A.2d at 300 (citation omitted).[17] Moreover, given that indemnification is founded in principles of equity, we can find no difference in the relative fault of the NHL and the NC of such a "kind" or "quality" as to have required the trial court to make the NC bear the entire cost of their dual negligence. *See supra* note 9.

■ Perhaps realizing that it would not be able to succeed on an indemnification argument, the NHL instead stresses an argument that the damages should be "apportioned" as between itself and the NC favorably to it. On the facts here, this is essentially an argument for adopting comparative negligence, which as already mentioned has never been the law in the District. The NHL's reliance on RESTATEMENT (SECOND) OF TORTS, *supra* note 5, § 433A, which seems to permit apportionment where there are "distinct harms," is inapposite here because, as the trial court found, "the acts of both tortfeasors working together in tandem are what caused a single injury ... that cannot be broken out ... into discrete parts." Thus, the contribution of each cause to the harm could not

---

17. This case is also different from our recent decision in *R. & G. Orthopedic Appliances & Prosthetics v. Curtin,* 596 A.2d 530 (D.C.1991). There, the hypothesized fact was that the second tortfeasor had aggravated the injury created by the original tortfeasor and the court applied the principle that in such circumstances, the second tortfeasor is liable for the extent of the aggravation. It is true that the aggravation occurred as a result of the second tortfeasor's failure to follow proper medical practices, which would have caused the damages from the original injury to be relatively minimal. It significantly

differs from the instant case, however, in that the subsequent tortfeasor in *R. & G. knew* about the risks that the prior tortfeasor's negligence had created and might have been expected to deal with them, while the NC here was never aware of the inaccurate blood test and hence could not know that it was in a position of assuming any duty to the NHL to deal with it. Moreover, *R. & G.,* hypothesized that the respective damage caused by the two tortfeasors could be differentiated, while here the trial court found a single, indivisible harm.

be established under § 433A(1)(b).[18] The NHL's reliance on *Lamphier v. Washington Hosp. Center,* 524 A.2d 729, 732 n. 2 (D.C.1987), is similarly misplaced. That case simply recognizes that different rules may apply where two tortfeasors sequentially commit independent harms, not the case here.

In sum, we find no ground for reversal in the trial court's ultimate conclusion that "based on the necessary facts decided by the jury by which ... I am bound," this was a "classic case for contribution between joint tortfeasors." We uphold the trial court's award of 50% contribution by each appellant, and in all other respects affirm the judgment appealed from.

*Affirmed.*

---

**18.** In any event, there would be no error in the trial court's protective finding that even if apportionment of any kind were permitted, he would have apportioned the liability equally anyway because this was not "an appropriate case for full or even partial indemnification...." It should be noted that "apportionment," correctly speaking, is a concept not dealing with rights as between tortfeasors as such, but rather one determining the amount of liability of each tortfeasor to the injured party. *See* PROSSER, *supra,* at 345.