Vida MOATTAR, Appellant,

v.

FOXHALL SURGICAL ASSOCIATES,
Richard P. Derosa, Appellees.

No. 94–CV–1389.

District of Columbia Court of Appeals.

Argued Feb. 7, 1996.
Decided April 30, 1997.

Gary S. Freeman, with whom Jack H. Olender, Harlow R. Case and Dan L. Gray, Jr., Washington, DC, were on the brief, for appellant.

David A. Levin, with whom Douglas K. Schrader, Annapolis, MD, was on the brief, for appellees.

Before WAGNER, Chief Judge, and KING, Associate Judge, and BELSON, Senior Judge.

WAGNER, Chief Judge:

The issue presented in this medical negligence case is whether the trial court may remove from the jury's consideration a claim for future loss of earnings where the plaintiff can adduce evidence sufficient to support a finding, to a reasonable degree of medical certainty, that she will die prematurely as a result of defendants' negligence. The case arises out of a claim for medical malpractice in which appellant, Vida Moattar, alleged that the eight month delay by appellee, Dr. Richard DeRosa, in diagnosing and treating her breast cancer caused her permanent injuries and damages and would probably result in her premature death. The trial court precluded Ms. Moattar's expert from testifying at trial regarding the present value of her future loss of earnings, concluding that the issue was not ripe for consideration until her cancer actually recurred or until her death. The trial court also instructed the jury that another jury in a future case would decide what damages would be awarded to Ms. Moattar or her heirs in the event that her cancer recurred. The jury awarded Ms. Moattar $150,000 to compensate her for damages through the time of trial. Concluding that the jury's inexplicable failure to award Ms. Moattar any damages for future mental anguish and embarrassment constituted a clear miscarriage of justice, the trial court granted her motion for a new trial for damages to the extent related to future noneconomic damages. However, the court adhered to its earlier ruling, to exclude from the new trial any consideration of future economic losses. Pursuant to D.C.App. R. 5, this court granted Ms. Moattar's application to determine "whether a jury should consider claims for future loss of earnings in a personal injury action where the plaintiff can demonstrate that because of defendant's negligence her life expectancy will probably be drastically reduced." We answer this question in the affirmative.

## I.

The evidence at trial showed that in November of 1989, Ms. Moattar went to see her gynecologist who found a lump in her right breast, which ultrasound confirmed as a solid nodule. The radiologist who performed the ultrasound recommended a biopsy of the mass. The gynecologist referred Ms. Moattar to the appellees, Dr. Richard DeRosa and Foxhall Surgical Associates, P.C. (Surgical Associates) for treatment. Dr. DeRosa was an agent or employee of Surgical Associates. In December of 1989, Ms. Moattar saw Dr. DeRosa, who concluded, without a biopsy, that the lump was benign. Although Dr. DeRosa saw Ms. Moattar twice after her initial visit, he still failed to biopsy the lump or to order an ultrasound of it. In August of 1990, Ms. Moattar was diagnosed with breast cancer in the right breast and underwent a mastectomy, breast reconstruction surgery, and chemotherapy.

At trial, Ms. Moattar presented two expert witnesses, a Board Certified general surgeon

and a Board Certified internist specializing in oncology, who both testified that it was "more likely than not" that she would not survive another four years. Ms. Moattar, a thirty-nine year old professional employed by the U.S. Department of Education and single mother of a two year old son, was prepared to offer testimony of an economic expert to establish the present value of her future economic loss given her diminished life expectancy.

Just before the trial commenced, Dr. DeRosa and Surgical Associates filed a motion *in limine* requesting the trial court to preclude Ms. Moattar from introducing evidence concerning her diminished life expectancy and future economic losses. Before ruling on the motion, the trial court allowed Ms. Moattar's counsel to address these issues in opening statement. Subsequently, during trial, reasoning that because of the degree of uncertainty concerning whether Ms. Moattar would have a recurrence of cancer and to avoid what it deemed to be prejudice, the trial court ruled that the issue of Ms. Moattar's economic loss due to her reduced life expectancy could not be presented to the jury. Therefore, the trial court ordered a separate trial on the issue pursuant to Super. Ct. Civ. R. 42 at such time as Ms. Moattar either experienced a recurrence of the cancer or died as a result of it. The trial court instructed the jury in that connection that

> if Ms. Moattar's cancer recurs and threatens her with an early death, then another jury, not you, will decide what damages she or her heirs should be awarded that stem from that recurrence.

The trial court also instructed the jury that Ms. Moattar's claim for future general damages would be annuitized over the years of her life, rather than paid in a lump sum, and that those payments would cease upon her death. The court gave the following instruction:

What you are to decide with respect to damages is what Ms. Moattar has already suffered and, ... what future physical pain, mental anguish, embarrassment, inconvenience, discomfort, disfigurement and humiliation Ms. Moattar will probably suffer in the future, assuming that she would live to a normal life expectancy that is to the age you conclude Ms. Moattar would live had Dr. DeRosa treated her according to the standard of care expected of him.

[O]n the jury verdict form you'll be asked to [put down] a dollar figure that you calculate for her future damages, assuming Ms. Moattar lives out her normal life expectancy, and every year of her life Ms. Moattar will have a guaranteed annuity for the amount you determine.

In other words, for her future damages, she will receive the dollar amount you decide on divided by the number of years you decide is her normal life expectancy and the pay out would end whenever Ms. Moattar, in fact, dies. And the reason for that is that obviously you don't suffer any more pain and suffering ... if, in fact you have died.

The jury found in favor of Ms. Moattar on the issue of liability and awarded her as damages to the date of its verdict, the sum of $150,000. It awarded Ms. Moattar no future damages for her noneconomic losses. In response to a special interrogatory on the verdict form, the jury found that Ms. Moattar's normal life expectancy would have been forty years, absent the physician's negligence.

Ms. Moattar filed a motion to certify to this court under D.C.Code § 11–721 the question raised by the trial court's rulings removing the issue of economic loss due to reduced life expectancy and ordering that the verdict be annuitized rather than in a lump sum.[1] She also filed a timely motion for a

---

1. D.C.Code § 11–721(d) provides in pertinent part that:

> When a judge of the Superior Court of the District of Columbia in making in a civil case ... a ruling or final order not otherwise appealable under this section, shall be of the opinion that the ruling or order involves a controlling question of law as to which there is substantial ground for a difference of opinion

and that an immediate appeal from the ruling or order may materially advance the ultimate termination of the litigation or case, the judge shall so state in writing in the ruling or order. The District of Columbia Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from that ruling or order, if application is made to it within ten days after the issuance or entry of the ruling or order.

new trial on the issue of damages and renewed her motion to certify the contested rulings on damages to this court. Subsequently, contending that the trial court had left her with no final judgment and no right to appeal, Ms. Moattar filed a petition for a writ of mandamus with this court seeking an order directing the trial court to grant a new trial on the issue of damages. One day later, the trial court entered its memorandum opinion and order holding that the jury's failure to award non-economic damages was "a miscarriage of justice," ordering a new trial on that issue, and certifying to this court pursuant to D.C.Code § 11–721(d) the two contested issues, the ripeness of the claim of future economic loss and the restriction of the verdict to an amount for an annuity rather than a lump sum. This court denied the request for a writ of mandamus, but granted the petition to appeal the trial court's ruling on the "ripeness" of her future economic damages claim.

## II.

■■■ Ms. Moattar argues that the trial court erred in removing from the jury's consideration her claim for future economic loss due to her diminished life expectancy. Dr. DeRosa and Surgical Associates argue that the trial court properly refused to submit the issue of loss of future earnings to the jury where there was no sign of a recurrence of cancer by the time of trial. They take the position that her claim is a premature attempt to recover damages under the Survival Statute (D.C.Code § 12–101) and Wrongful Death Statute (D.C.Code § 16–2701).[2]

■■ A claim for damages for loss of future earnings resulting from injuries suffered due to the negligence of others is a cognizable element of damages during the life of the injured party. *District of Columbia v. Barriteau*, 399 A.2d 563, 567 (D.C.1979). Here, we are dealing with loss of earnings recoverable by the injured party in a medical negligence case, not in a survival action. *See Monias v. Endal*, 330 Md. 274, 623 A.2d 656, 659 (1993). The prevailing view is to allow recovery for economic losses based on a plaintiff's lifespan if unaffected by the injury resulting from the defendant's negligence. *Burke v. United States*, 605 F.Supp. 981, 989 (D.Md.1985) (citations omitted). As this court stated in *Barriteau*, this element of damages represents "the amount that the injured party would have earned but for the injury." 399 A.2d at 567 n. 6. The allowance for such recovery is consonant with the principal purpose for compensatory damages in such cases, which is to make the victim whole. *See id.* at 566.

The allowance of future economic losses resulting from diminished life expectancy is *not* a premature attempt to recover wrongful death and survival damages, as Dr. DeRosa and Surgical Associates contend, but an element of damages recoverable by the injured party during her lifetime where properly proved. *See Sea–Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 594, 94 S.Ct. 806, 819, 39 L.Ed.2d 9 (1974). In addressing the point in *Sea–Land*, the Supreme Court stated that:

> [U]nder the prevailing American rule, a tort victim suing for damages for permanent injuries is permitted to base his recovery "on his prospective earnings for the balance of his life expectancy at the time of his injury *undiminished by any shortening of that expectancy as a result of the injury*."

*Id.* (emphasis in original) (citations omitted). The Supreme Court rejected Sea–Land's double-liability argument.[3] While recogniz-

---

2. The Wrongful Death Act provides a remedy for close relatives, who might have been entitled to maintenance and the like from the decedent, to recover compensatory damages from the tortfeasor for wrongful death. *Semler v. Psychiatric Inst. of Washington, D.C., Inc.*, 575 F.2d 922, 924–25 (D.C.Cir.1978). Under the Survival Act, actions in tort survive the death of the deceased person, and the decedent's estate may recover prospective economic benefits which include net lifetime earnings discounted to present worth. *Hughes v. Pender*, 391 A.2d 259, 261 (D.C.1978).

3. In *Sea–Land*, the issue was whether the widow of a longshoreman could maintain a wrongful death action for his death in navigable waters after her husband had recovered damages in his lifetime for his injuries. The decedent had recovered for his permanent disability, physical pain and suffering, and loss of earnings in an action, but he died shortly after the action was terminated. *Sea–Land, supra*, 414 U.S. at 574, 94 S.Ct. at 809–10. The issue whether a wrongful death action is available to dependents of a decedent

ing that there may be some overlap between the injured party's recovery for future loss of wages and a dependent's subsequent claim for support in a wrongful death action, the Supreme Court deemed collateral estoppel principles sufficient to avoid double recovery. 414 U.S. at 592, 94 S.Ct. at 818.

The reliance of Dr. DeRosa and Surgical Associates upon this court's decision in *Cole, Raywid & Braverman v. Quadrangle Dev. Corp.,* 444 A.2d 969 (D.C.1982) is misplaced. They contend that in *Cole,* this court rejected an attempt by a law firm to recover damages arising out of the death of a managing partner because it could only be pursued under the Wrongful Death statute. In *Cole,* this court upheld the dismissal of the law firm's complaint because it was based upon a statutory right of action which had to be brought in the name of the personal representative of the decedent's estate for the benefit of the decedent's spouse and next of kin. 444 A.2d at 972. The law firm did not, and could not, claim that status. Therefore, we held that their complaint failed to state a cause of action under the Wrongful Death statute. In this case, we have the injured party seeking to recover on her own behalf damages for medical negligence which she is entitled to pursue.

The trial court in this case expressed its concern with the "closeness of the survival question," the high stakes involved, and the potential for substantial over-compensation or under-compensation. It cited these reasons for taking the novel approach of deferring Ms. Moattar's right to prove her claim, either personally or through the personal representatives of her estate, when there would be a greater certainty that she had actually suffered a recurrence of the cancer or death. This approach is contrary to relevant caselaw in this jurisdiction which permits the injured party, upon a proper showing, to recover such damages during his or her lifetime. *See Barriteau, supra,* 399 A.2d at 567.

who had litigated tort actions arising out of the same alleged wrong is not before us in this case.

■ Of course, "[the] recovery of damages based on future consequences of a tort is available only if such consequences are reasonably certain." *Curry v. Giant Food Co. of D.C.,* 522 A.2d 1283, 1291 (D.C.1987). "Unless there is nonspeculative evidence demonstrating that future suffering, additional medical expense, and loss of income will occur, the question should not be submitted to the jury." *Id.* The "reasonably certain" standard may be met where the plaintiff proves

> that it is more likely than not (a greater than 50% chance) that the projected consequence will occur. If such proof is made, the alleged future effect may be treated as certain to happen and the injured party may be awarded full compensation for it; if the proof does not establish a greater than 50% chance, the injured party's award must be limited to damages for harm already manifest.

*Wilson v. Johns–Manville Sales Corp.,* 684 F.2d 111, 119 (D.C.Cir.1982).

Here, Ms. Moattar presented competent expert medical evidence that, to a reasonable degree of medical certainty, she will "more likely than not" die prematurely due to appellees' negligence. There was evidence that when Ms. Moattar was diagnosed finally, cancer cells were discovered in her lymphnodes. Although apparently cognizant that Ms. Moattar had made a *prima facie* showing on this issue, the court expressed concern that Dr. DeRosa and Surgical Associates had experts who would testify otherwise. Their experts posited that Ms. Moattar had "a better than 50 percent chance of survival." In particular, they pointed to characteristics of her excised cancerous tissue that indicated very favorable prospects expected from her chemotherapy treatment and her three years of living without a recurrence. When there is conflicting expert testimony in a trial, it is the jury's function to resolve it, applying standards set forth in the court's instructions.[4] It is not unusual for a jury in a medical negligence case to have before it conflicting evidence. That is not a basis for

4. *See* STANDARDIZED CIVIL JURY INSTRUCTIONS FOR THE DISTRICT OF COLUMBIA, No. 3–4 (EXPERT OPINION CONFLICT) (Rev. ed.1985).

removing an issue from the jury until more persuasive evidence can be obtained by one side or the other. Having presented evidence that it was more probable than not that she would suffer a recurrence of cancer and a specific shortened life expectancy, Ms. Moattar was entitled to present evidence of her future economic losses and have the jury resolve the issue.

Moreover, Ms. Moattar was required to pursue her case for all damages associated with her claim. *See Colbert v. Georgetown Univ.,* 641 A.2d 469, 474 (D.C. 1994) (en banc). A right of action accrues when the injured party knows or should have known "that she ha[s] suffered injury as a result of the defendants' negligence." *Id.* at 473. A plaintiff injured by a physician's negligence in failing to diagnose breast cancer, knowing that it is more probable than not that her cancer will metastasize, cannot split her claim and wait until the cancer recurs before bringing suit. *Id.* at 475–76. In this jurisdiction, under such circumstances, a plaintiff is entitled to include in her claim, and recover for, future consequences based on the probability of metastasis and of hastened death. *Id.* at 474.

In reaching its decision, the trial court relied on the "ripeness" doctrine as explained in the Supreme Court's decision in *Abbott Lab. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967), which focuses on the question of the competence of courts to resolve disputes before they are sufficiently refined administratively. *See id.* at 148–49, 87 S.Ct. at 1515–16. In *Abbott,* the Supreme Court stated that the doctrine's

> basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.* We are not persuaded that considerations embodied in the ripeness doctrine are applicable here or can form a basis for deferring a plaintiff's claim in a medical negligence case where she has presented evidence of the probability of future damages to the extent required by our precedents.

Finally, we conclude that the trial court abused its discretion in bifurcating Ms. Moattar's proof of the various elements of her damages under Super. Ct. Civ. R. 42(b). The trial court's decision was based, in part, upon an erroneous understanding of the controlling legal principles, which may result in an abuse of discretion. Moreover, Rule 42(b) permits bifurcation of issues "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy." These goals are not achieved by the court's ruling in this case. Much of the same evidence involved in proving Ms. Moattar's noneconomic losses would have to be presented to prove her economic losses. Where issues involve the same evidence, bifurcation under the rule should ordinarily be denied. *See* 5 James WM. Moore, MOORE'S FEDERAL PRACTICE § 42.03[1] at 42–61 (2nd ed.1996). Rather than promoting convenience, expedition and judicial economy, bifurcation of the damages issues simply delays or, perhaps forecloses, Ms. Moattar from presenting her own claim and testifying before the jury which will decide her case. It also causes the additional expense of a second trial to both sides.

For the foregoing reasons, we conclude that the trial court erred in precluding Ms. Moattar from presenting her claim for future economic losses. Therefore, we remand the case to the trial court for a new trial on the issue of all damages, including future economic loss.

*Reversed* and *remanded.*

KING, Associate Judge, concurring and dissenting:

This case is one of the first of the next generation of cases involving misdiagnosis of cancer followed by treatment and remission arising in the wake of our en banc opinion in *Colbert v. Georgetown Univ.,* 641 A.2d 469 (D.C.1994) (en banc). In *Colbert,* the plaintiff claimed there was a misdiagnosis of her cancer in 1982, followed by a mastectomy and painful and extensive treatment over the next nine months which caused the cancer to

go into remission. Mrs. Colbert was informed, however, that "the probability of metastasis and early death [was] ... ninety percent as a result of the defendants' negligence." *Id.* at 474. Although she could have brought an action at that time · to recover damages for past expenses and suffering, Mrs. Colbert chose not to. The cancer recurred in late 1986 and the negligence action was filed just under three years later. We held that the action had been brought after the expiration of the three year statute of limitation, concluding that Mrs. Colbert knew enough in 1982 about both her past injury and her future prospects to bring the action then for both past and future damages. Thus, to avoid dismissal on statute of limitation grounds, Mrs. Colbert should have brought her action within three years of her learning this information. Therefore, the deadline for filing occurred in 1985, and the action filed in 1989 was some four years too late.

In this case the claimed misdiagnosis occurred in December 1989. In mid 1990 Ms. Moattar underwent a mastectomy which was followed by treatment that extended into late 1990, resulting in the cancer going into remission. The complaint, filed in November 1992, sought damages for past injuries and for future noneconomic damages and post-death loss of income. By filing her complaint when she did, Ms. Moattar avoided the statute of limitation problem that barred Mrs. Colbert's action. There is one crucial difference, however, between the circumstances in *Colbert* and those presented here. While it was undisputed that there was a ninety percent probability that Mrs. Colbert's cancer would recur and cause early death, there is considerable disagreement concerning the likelihood of recurrence here. Indeed, there was testimony from defense experts that there was a better than fifty percent chance of long term survival, while plaintiff's experts could only say that recurrence was more

likely than not within four years. No expert placed the probability of recurrence anywhere near the range of likelihood that existed in *Colbert*. In order to avoid a premature rush to judgment on the question of post-death economic damages, the trial court severed that issue for resolution at some later point when information concerning Ms. Moattar's "probability of survival would be much more definite."

I agree that the trial court should be reversed but not for the reasons expressed by the majority. In my view the trial court did not abuse its discretion, under the circumstances presented here, in ordering a separate trial at a later date on the issue of post-death economic damages, because that issue was not then ripe [1] for decision; however, for the reasons discussed below, I believe that ruling should have been conditioned upon defense agreement to a dismissal of the future damages claim without prejudice to its being reinstated when, and if, the cancer recurred, coupled with a waiver of the statute of limitations for the future damages claim.

**I.**

The defense motion to sever the post-death economic damages issue was made and granted, over the plaintiff's objection, before trial. The trial was conducted in May 1994 resulting in a verdict for the plaintiff and an award for damages for losses that occurred previously. The pretrial severance ruling was again challenged in a motion filed after the verdict. That motion was denied and the trial court's ruling on the issue, as well as its ruling on one other issue which is not before us for decision,[2] is set forth in a comprehensive opinion issued in September 1994. *See Moattar v. Foxhall Surgical Assoc.,* 122 Wash D.L. Rep.1981 (D.C.Super.Ct.1994). With respect to the governing facts, the court observed:

---

1. While I am satisfied that the trial court did not abuse discretion when it concluded that the issue was not then ripe for decision, I agree with the majority that that decision cannot be grounded in the so-called "ripeness doctrine," as described in *Abbott Lab. v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). *Ante* at 440.

2. This case is before us based upon a certification by the trial court, pursuant to D.C.Code § 11–721(d) (1995 Repl.), of this and a second issue relating to annuitizing future noneconomic damages. We granted review only on the issue of future economic damages.

Vida Moattar, a 39 year old college educated professional woman, sued Dr. Richard DeRosa a general surgeon to whom she had been referred by her OB/GYN, for failing to diagnose her breast cancer in a timely manner. The gist of her claim was that Dr. DeRosa's eight month delay in performing a biopsy on a small lump in her breast was malpractice that led to very severe consequences—the loss of her breast to cancer, breast reconstruction, the violence of chemotherapy, and intense mental anguish and depression from fears that she would meet an early death leaving her 2 year old son parentless. Dr. DeRosa's position was that the tragedies in Ms. Moattar's life were not of his making—that he had acted appropriately in closely monitoring but not precipitously performing a biopsy of what to all appearances was a small benign cyst or adenoma.

The traditional standard placing on Ms. Moattar the burden of proving it was more likely than not Dr. DeRosa had fallen below recognized medical standards and caused her injuries was adequate guidance for a jury to [evaluate] liability. The troubling issue in the lawsuit related to future damages, Ms. Moattar's claim that although she was now free of cancer she nevertheless faced the likelihood of an early death that would cause her to lose decades of earnings in the work force. While no District of Columbia case was directly on point both the United States Supreme Court in discussing general common law principles and Maryland courts in the medical malpractice context have ruled that a tort victim suing for damages is permitted to base his recovery "on his prospective earnings for the balance of his life expectancy at the time of his injury *undiminished by any shortening of that expectancy as a result of the injury.*" *Sea–Land Services, Inc. v. Gaudet,* 414 U.S. 573, 594, 94 S.Ct. 806, 819, 39 L.Ed.2d 9 (1974) (citation omitted; emphasis in original), *see Monias v. Endal,* 330 Md. 274, 623 A.2d 656 (1993). Plaintiff had an economic expert who was ready to place a million dollar price tag on

that part of her damage claim and two cancer experts who, it was proffered, would testify it was more likely than not Ms. Moattar would be dead within four years.

\* \* \* \* \* \*

Plaintiff put on two doctors, Dr. Witman, a cancer specialist and Dr. Battle, a surgeon specializing in colon and breast cancer. In essence, they testified it was more likely than not Ms. Moattar would be dead of cancer within the next four years. Defendant, on the other hand, had equally credentialed cancer experts who gave Ms. Moattar a better than 50 percent chance of survival. In particular, they pointed to characteristics of her excised cancerous tissue that indicated very favorable prospects expected from her chemotherapy treatment and the fact that Ms. Moattar had been carefully monitored for three years and nine months with no sign of the cancer's recurrence. With each passing month Ms. Moattar's chances improved. All of the experts, those for Ms. Moattar as well as those who sided with Dr. DeRosa, thought the five year mark from cancer excision would be a key marker. If Ms. Moattar successfully passed that hurdle her chances of disease free survival were significantly improved.

In sum, the state of the record was that Ms. Moattar's cancerous tissue had been removed, no evidence of cancer had been detected since the surgery, the experts hovered on their respective sides of a 50 percent chance of survival, and within a few years Ms. Moattar's prognosis would be very much clearer.

*Id.* at 1981, 1986 (footnote omitted). The jury awarded $150,000 for past damages. Although the record is not entirely clear, most of this sum was awarded for noneconomic damages because Ms. Moattar apparently was absent from work only for a period of about eight weeks[3] during the time she was being treated in 1990.

---

**3.** At the time of trial Ms. Moattar's annual salary was approximately $40,000, thus her gross earn-

ings for eight weeks would be just over $6,000.

In addition, as the trial court discussed in the above excerpt from its opinion, Ms. Moattar sought to recover for future economic damages. Because she had worked continuously after her treatment, and was expected to continue working unless and until recurrence of the cancer prevented her from doing so, the future economic damages she was seeking were for lost wages that would occur after she died from the recurrence of the cancer. In short, she claimed that she was entitled to recover now, the economic damage that would otherwise accrue to her estate after her death, *i.e.*, the damages sought by Ms. Moattar were identical to the damages available to her estate after her death pursuant to the survival statute.[4] See D.C.Code § 12–101 (1995 Repl.). The defense, objecting to recovery of such damages on the ground that they were premature and speculative, moved in limine to prevent such recovery until such time, if ever, it became more likely, than it was at the time, that death from the recurrence of the cancer would occur. The trial court granted the motion, later observing in the opinion cited above, that was issued after the verdict:

> Rule 42 of the Superior Court Civil Rules allows a judge to order separate trials of claims or even of issues where severance is warranted to avoid undue prejudice. It was my belief that deciding liability and damages through trial in this trial while severing out the future wage loss claim for some future time if and when Ms. Moattar's cancer recurred, best served those ends.

> As matters stood, if this jury decided whether Ms. Moattar would succumb in four years (the plaintiff's position) or was more likely to live out a normal life span (defendant's position) there was a real likelihood of either substantial overcompensation or undercompensation. Ms. Moattar would be overcompensated for decades of non-existent lost wages, $1 million dollars in plaintiff's estimation, if the jury concluded she would soon die but her cancer did not recur. On the other hand, if the jury

rejected the statistical probabilities put forth by plaintiff's experts and accepted the statistical probabilities put forth by defendant's experts that Ms. Moattar had turned the corner and did not face an early death, she would be forever barred from seeking compensation even if her cancer in fact recurred and she succumbed.

This may not seem at all novel. Juries are routinely asked to decide questions of great uncertainty. Here, however, considerations in addition to the closeness of the survival question and the high stakes involved pointed to taking a different approach. Preeminent among these was the certainty that within just a few years much better information would be available. All of the experts agreed that in less than two years, at the five year marker, the statistical information as to Ms. Moattar's probabilities of survival would be much more definite. A decision down the line, then would be much more rationally based.

\* \* \* \* \* \*

Additionally, in a very real sense, compensation at this time for Ms. Moattar's future wage loss was not necessary to provide her with a fair redress for her injuries. True enough, every time a jury compensates a plaintiff for future losses the plaintiff is being given an advance payment. But here, not only would the payment be made in advance, but, in a way, payment would be made to the wrong beneficiary. Ms. Moattar's future wage loss claim was premised not on a lengthy disability for which she would need substantial income, but on loss of income from death itself. The beneficiary of *that* claim would be her estate, not Ms. Moattar.

It also bears emphasis that given the nature of the medical malpractice claim in this case—that Dr. DeRosa allowed a cancer to develop necessitating the removal of Ms. Moattar's breast—there was a real likelihood of an emotionally laden jury decision despite the court's usual instructions to the contrary. All of these factors coun-

---

**4.** *Compare George Washington Univ. v. Waas,* 648 A.2d 178, 182 n. 7 (D.C.1994) (determining post-death economic loss where subject was still alive) with *Runyon v. District of Columbia,* 150 U.S.App. D.C. 228, 231, 463 F.2d 1319, 1322 (D.C.Cir.1972) (same determination; but damages awarded after death of the subject under survival statute).

seled against deciding the future wage loss claim at this time.

\*    \*    \*    \*    \*    \*

There are, of course, considerations that favored hearing and deciding the future wage loss claim at this juncture. As a general matter, plaintiff's choice of when to bring a lawsuit should be respected. This is especially so considering the anguish Ms. Moattar must feel in reliving the pain of what is no doubt the most devastating experience of her life. A court should have considerable hesitation in upsetting her choice of when to tell that sad story. But, if her cancer recurs, her burden would be the cancer, not a legal proceeding for which she may well be too ill to testify. Additionally, while plaintiff's counsel argued that deferring the future wage loss claim would deprive plaintiff of her best witness, Ms. Moattar is the best witness on that issue only in the most sympathetically irrelevant sense. The future wage loss of a professional woman who works for the federal government does not demand her testimony.

*Id.* at 1986–87.

Rule 42(b) of the Superior Court Rules of Civil Procedure provides that the trial court "in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim ... or of any separate issue...." Pursuant to this provision the trial court ordered a separate trial on the claim for post-death economic damages to be conducted when, and if, such damages either became a reality, or the likelihood that such damages will occur is less speculative than they were at the time the trial court ruled. Although this court has never addressed the standard of review applicable to trial court rulings under Super. Ct. Civ. R. (42)(b), the federal courts all agree that review is for abuse of discretion.

As one court has said: "Rule 42(b) is sweeping in its terms and allows the court, in its discretion, to grant a separate trial of any kind of issue in any kind of case." *In re Bendectin Litigation,* 857 F.2d 290, 308 (6th Cir.1988) (quotations omitted); *United States v. 1,071.08 Acres of Land,* 564 F.2d 1350, 1352 (9th Cir.1977). The majority concludes that the trial court abused its discretion in ordering the separate trial. In doing so it principally relies upon three cases that are readily distinguishable.

For example, the majority relies upon language found in *District of Columbia v. Barriteau,* 399 A.2d 563 (D.C.1979), where the court stated that "future loss of earnings resulting from injuries due to the negligence of others is a cognizable element of damages during the life of the injured party." *Ante* at 438. Reliance on that language is problematic for two reasons. First, the *Barriteau* court was speaking about pre-death, not post-death, economic damages.[5] In addition, there was no doubt whatever that there would be a future loss of earnings during Barriteau's lifetime, because she was unable to continue working as a nursing assistant as a result of the conceded negligence of the defendants. Under those circumstances, Barriteau was entitled to recover for future earnings which she would lose during her working life because of the defendants' negligence. In contrast, Ms. Moattar has worked continuously since 1990 and the only economic damages she now seeks, beyond what the jury awarded in past damages, are lost wages that would occur after her death should the cancer recur.

The majority also relies upon two other cases where the court allowed the plaintiff to recover for post-death economic losses over defense objection that awarding such damages was premature. *Monias v. Endal,* 330 Md. 274, 623 A.2d 656 (1993); *Burke v. United States,* 605 F.Supp. 981 (D.Md.1985).

---

5. Damages awarded under each of these circumstances serve different purposes and are measured differently. Pre-death economic damages serve as a substitute for after-tax income that will be lost because of the plaintiff's injuries, and are calculated by determining work-life lost income and subtracting a sum for federal and local income taxes. *National Health Lab. v. Ahmadi,* 596 A.2d 555, 560 n. 14 (D.C.1991). Post-death economic damages represent the sum that would accrue to the estate. Because the deceased has no living expenses, that factor, along with income taxes, must be subtracted from the income determined to be lost. *George Washington Univ. v. Waas, supra* note 4, 648 A.2d at 182 n. 7.

Both cases, like Ms. Moattar's, involved a misdiagnosis of cancer, followed by surgery, treatment, and the filing of an action seeking damages for both past and future losses. In both of the other cases, however, the evidence concerning the likelihood of recurrence of the cancer was considerably more pessimistic than is so here. In *Monias,* the undisputed testimony was that the patient had only a twenty percent chance of survival beyond a date approximately five years after she was treated. 623 A.2d at 657. In *Burke,* the prognosis was even bleaker: it was undisputed that there was an 80–85% chance of recurrence within five years and only a 10% chance of survival for ten years. 605 F.Supp. at 987.

In contrast, Ms. Moattar's experts could only say that it was more likely than not that her cancer would recur within four years after she was treated, while the defense experts were of the view that it was more likely that there would be no recurrence.[6] That testimony was given in May 1994, approximately three and a half years after the cancer went into remission. As the trial court observed: "All of the experts agreed that in less than two years, at the five-year marker, the statistical information as to Ms. Moattar's probability of survival would be more definite." *Moattar, supra,* at 1986. During the pendency of this appeal that five-year milestone has come and gone. Although we do not know what Ms. Moattar's condition is today—six and one-half years after she was treated—we would expect, because her future prospects played a decisive role in the trial court's decision to delay, that any change would have been brought to the attention of both this court and the trial court. In any event, the chance of recurrence, when the trial court ruled, was very much in doubt and certainly not so likely as it was in the two cases relied upon by the majority.

In the face of this uncertainty regarding the likelihood of recurrence, the trial court was properly concerned that deciding post-death economic losses would be too speculative an undertaking at that time. Delaying the decision was deemed to be the most prudent course and the one chosen by the trial court. Under all the circumstances, I cannot say that determination was an abuse of discretion, especially where the discretion given the trial court in making that determination was pursuant to Rule 42(b) which is "sweeping in its terms." *Bendectin Litigation, supra,* 857 F.2d at 308.

### II.

Having concluded that the trial court did not abuse its discretion in severing the claim for post-death damages does not end the analysis of the propriety of the trial court's decision to delay resolution of that issue. In my view, for the reason discussed below, the trial court should have taken at least one additional step.

The drawback to the trial court's resolution of this issue is that it prevents the plaintiff from collecting any judgment for past damages until the severed claim is itself finally resolved. To illustrate the collection problem facing Ms. Moattar, assume, after a severance of the future damages claim like the one ordered here, that the jury reaches a verdict based upon past damages that is satisfactory to the plaintiff, and that the trial court has disposed of any defense post-verdict motions in the plaintiff's favor. Also assume that the defense wishes to pursue an appeal. If the severed claim did not exist, judgment would be entered, an appeal would be filed, and execution of judgment would undoubtedly be stayed conditioned upon the filing of an appropriate bond. *See* Super. Ct. Civ. R. 58, 62, 62–I; D.C.App. R. 4, 8; see, for example, *Pierola v. Moschonas,* 687 A.2d 942, 945 n. 2 (D.C.1997) ("where appeal is taken from a money judgment, the appellant may obtain a stay of proceedings to enforce judgment by posting a supersedeas bond"); *cf Lomax v. Spriggs,* 404 A.2d 943 (D.C.1979); *Trilon Plaza Co. v. Allstate Leasing Corp.,* 399 A.2d 34 (D.C.1979), *District of Columbia v. Tschudin,* 390 A.2d 986 (D.C.1978). In due course, the appeal would

---

**6.** In *George Washington Univ. v. Waas, supra* note 5, damages for post-death economic loss were awarded where the likelihood of recurrence of the cancer was less than the likelihood of recurrence here. That case, however, did not present the issue whether the determination of such damages could have, or should have, been postponed.

be decided and if the plaintiff prevailed, collection efforts on the judgment could begin.

If, however, the severed claim is left unresolved, there is no final judgment to be appealed. D.C.Code § 11–721 (1995 Repl.); *In re Estate of Chuong*, 623 A.2d 1154, 1157 (D.C.1993) (en banc); *McDiarmid v. McDiarmid*, 594 A.2d 79, 81 (D.C.1991); *Dyhouse v. Baylor*, 455 A.2d 900, 901 (D.C. 1983). But until this court has reviewed and affirmed a verdict in favor of the plaintiff when the defense seeks our review, there can be no execution of any "judgment" received. *Jonathan Woodner Co. v. Breeden*, 681 A.2d 1098, 1100 (D.C.1996) (plaintiff cannot obtain execution on a judgment until after this court has affirmed the judgment in its favor), *cert. denied*, —— U.S. ——, 117 S.Ct. 1083, 137 L.Ed.2d 217 (1997); *Merrell Dow Pharm. v. Oxendine*, 593 A.2d 1023, 1026–28 (D.C.1991); *cf. Robinson v. Sarisky*, 535 A.2d 901, 908 (D.C.1988). Therefore, because the final judgment rule bars an appeal,[7] and execution on the judgment depends upon the plaintiff's success on appeal, the plaintiff would be left with an uncollectible "judgment" because of the delay in resolving the severed claim—a delay granted at the behest of the defense over plaintiff's objection.

In order to avoid these hurdles, the plaintiff could dismiss the severed claim in order to effect a final judgment, but that course is unacceptable because under *Colbert*, a plaintiff could be barred from re-bringing that claim if the cancer recurred, by a plea of the statute of limitation. Plaintiff should not be forced to forego recovery of possible future losses in order to collect what she may be entitled to receive in the form of damages suffered in the past. Alternatively, the plaintiff could wait until the future loss claim is resolved, thereby giving her a final judgment. The wait, caused entirely by the defense's insistence that the future loss claim be delayed until it is ripe, could well be a long one, however. From the plaintiff's point of view, that solution is also unsatisfactory. A way of avoiding the undesirable courses of action presented by severance, would be to condition the grant of the defense request for delayed resolution of the future damages claim upon defense agreement to allow the plaintiff to split her claim. *Cf. Colbert, supra,* 641 A.2d at 475.

In *Gilles v. Ware*, 615 A.2d 533, 535, 545, 549–50 (D.C.1992) (per curiam), we adopted RESTATEMENT (SECOND) OF JUDGMENTS Sec. 26(1)(A) (1982) which permits claim-splitting when the parties agree or when the defendant has acquiesced. *See also Ifill v. District of Columbia*, 665 A.2d 185, 193 (D.C. 1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 1570, 134 L.Ed.2d 669 (1996). The defense is free to acquiesce or not, but I see no reason why, in the exercise of its discretion pursuant to Rule 42(b), the trial court could not condition the grant of a severance upon the defense's agreement to allow the claims to be split. If the defense agrees, the future damages claim can be severed, and dismissed without prejudice accompanied by a waiver of any statute of limitations claim.[8] If the cancer recurred, the plaintiff could simply move to vacate the dismissal and the future damages issue could then be resolved without the fear of a statute of limitations challenge.

---

7. It is doubtful that a certified appeal, which is the jurisdictional basis for the instant appeal, would be available because of the unlikelihood that any action by the trial court, in the course of trial on the issue of past damages, would include a ruling that "involves a controlling question of law as to which there is a substantial ground for a difference of opinion [justifying] ... an immediate appeal ..." as required by the governing statute. See D.C.Code § 11–721(b) (1995 Repl.). Moreover, it is far from clear that the trial court could properly enter "final judgment" on the past damages claim pursuant to Super. Ct. Civ. R. 54(b), because there is a significant question whether that claim would be sufficiently "separable" from the severed claim or that this court would permit an appeal on that basis. *See Peo-*

*ples v. Warfield and Sanford*, 660 A.2d 397, 401–02 (D.C.1995) (because a Rule 54(b) certification confers subject matter jurisdiction upon this court, we must be satisfied of the propriety of a certification). In any event, and to avoid the uncertainty of whether an appeal would lie under either of these two procedures, the course of action suggested in the text will ensure an appealable final order.

8. Such a waiver would not necessarily have to be open ended. For example, waiver of the statute of limitations could be conditioned upon the plaintiff moving to vacate the dismissal within some specified time after the discovery that there has been a recurrence.

In another context, we routinely impose such a requirement. For example, any grant of a defense motion to dismiss on *forum non conveniens* grounds must be accompanied by a defense waiver of the statute of limitations. *See, e.g., Kaiser Foundation Health Plan, Inc. v. Rose,* 583 A.2d 156 (D.C.1990); *Mills v. Aetna Fire Underwriters Ins. Co.,* 511 A.2d 8, 14 (D.C.1986). We require such a waiver, in part, because the defense should not be permitted to profit from the delays attendant to resolution of the *forum non conveniens* issue. Similarly in the circumstances presented here, if the defense wishes to delay resolution of the future economic loss claim, it should not be permitted to gain an advantage by preventing the plaintiff from timely collecting on its verdict for the past damages.

In this case the trial court did explore the possibility that the defense waive the statute of limitations. Although the defense initially expressed uncertainty, it ultimately declined to do so. The defense was under no obligation to waive, but under the circumstances, the trial court, in my view, for the reasons discussed above, should have refused to sever the claim unless there was a waiver. Although, as I have said above, I am satisfied that the trial court's decision to sever the future damages claim was not, standing alone, an abuse of discretion, the trial court should have conditioned [9] that grant upon a waiver of the statute of limitations.[10] For that reason I concur in the result reached by the majority.

---

**9.** I note that the plaintiff never sought such a condition; therefore, the trial court had no reason to impose it.

**10.** In some circumstances it might also be appropriate for the court to condition severance upon the posting of a bond with sufficient sureties.